Burton BLISTEIN

v.

ST. JOHN'S COLLEGE.

Civ. No. K–93–2716.

United States District Court,
D. Maryland.

Aug. 16, 1994.

Raymond C. Fay and Christopher G. Mackaronis, and Bell, Boyd & Lloyd, of Washington, DC, for plaintiff.

Peter E. Keith and Julie Ellen Squire, and Gallagher, Evelius & Jones, of Baltimore, MD, for defendant.

FRANK A. KAUFMAN, Senior District Judge:

There is pending before this Court defendant's motion for summary judgment, or in the alternative, declaratory judgment based upon plaintiff's retirement agreement and retention of benefits, filed February 24, 1994, and response and reply thereto; plaintiff's motion for summary judgment, filed March 2, 1994, and response and reply thereto; Defendant's motion for summary judgment, filed March 3, 1994, and response and reply thereto; and the supplemental filings by plaintiff and defendant. The facts relevant to these motions are largely set forth in this Court's Memorandum and Order dated April 21, 1994,[1] and are reproduced here, with minor changes and additions.

## FACTS

St. John's College hired Burton Blistein in August 1972 as the College's artist-in-residence, a year-to-year, non-tenure position. That job entailed teaching and running the College's visual arts department. At the time of his resignation in June 1992, plaintiff taught classes in life-drawing and sculpture, conducted field trips for students to museums, assisted students with individual projects and academic papers, coordinated the building of a bronze casting foundry, and administered visual arts electives through

---

1. Non-duplicative portions of that Memorandum and Order are attached hereto as Appendix A.

the Graduate Institute. At St. John's College, where all students take the same core courses and receive the same degree, there is no degree program in the visual arts, nor are there course requirements in that area. Rather, art courses are solely electives offered by the College's Graduate Institute, in which students and citizens of the community may participate.

According to the College, the College was facing financial difficulties in June 1992. As a result, college officials instituted various cost-cutting measures, including freezing the base salaries of tutors; tightening policies on sick leave, short-term disability and health insurance benefits; and failing to replace employees who retired. An additional one of those measures was the elimination of plaintiff's job, which President Christopher Nelson considered non-essential to the core college curriculum upon the recommendation of the Dean, Eva Brann, and the Treasurer, Fred H. Billups, Jr. President Nelson hoped that upon elimination of plaintiff's job, plaintiff would retire and continue to teach as an independent contractor.

On June 8, 1992, Billups met with plaintiff and informed him that his position was to be abolished as of December 30, 1992, for financial, rather than performance, reasons. At that time, plaintiff was 61 years old. Billups told plaintiff that the College was giving him the option of either resigning his position and retiring prior to June 30, 1992, or waiting until December 1992 when the position would be abolished. Although plaintiff asked for time to make a decision until he returned from a July vacation, the College insisted on an answer by June 30, 1992. Billups explained that the College was changing its policy regarding eligibility for post-retirement medical benefits as of July 1, 1992, and that under the terms of the new policy, plaintiff would not be eligible for post-retirement medical benefits if his termination occurred after July 1, 1992. Plaintiff chose to retire as of June 30, 1992.

On June 12, 1992, plaintiff met with Billups and submitted a list of requested benefits. That list, which was then typed and signed by both plaintiff and Billups, provides for various benefits to plaintiff including: tuition

assistance for plaintiff's children, life-time medical benefits for plaintiff, medical benefits for plaintiff's dependent children, approximately $15,000 in severance pay, and art studio space provided to plaintiff at no charge. On June 12, 1992, Blistein also gave the college a handwritten letter stating: "I am resigning as St. John's Artist in Residence effective June 30, 1992." Since June 1992, plaintiff has received the agreed upon benefits.

As of Blistein's resignation effective June 30, 1993, the position of artist-in-residence has not been filled. Instead, plaintiff's former job duties are currently handled by a variety of individuals, who range in age from the late 20s to an individual in her 50s. The College claims to have saved $56,000 per year through abolishment of plaintiff's position.

In December 1992, plaintiff contacted the Maryland Commission on Human Rights to file a charge of age discrimination. The formal charge of age discrimination was signed on February 25, 1993, and was forwarded to the EEOC, which, in turn, forwarded a copy to St. John's college. By letter dated April 14, 1993, the College advised counsel for plaintiff that if plaintiff was not going to live up to the agreement, the College would reconsider whether it should provide the benefits required by the agreement. Following a May 18, 1993, conversation between counsel for plaintiff and defendant, by letter dated May 20, 1993, plaintiff's counsel wrote defendant:

This will confirm our conversation of May 18, 1993. As I explained to you, in light of the Supreme Court's recent decision in *Hazen Paper Co. v. Biggins,* Mr. Blistein has determined that it would not be in his best interests to pursue his age discrimination claim against your client. Accordingly, he will in the near future be withdrawing his claim of discrimination which has been filed with the Equal Employment Opportunity Commission and with the Maryland commission on Human Relations.

As we confirmed in our conversation, upon his withdrawal of his EEOC Charge, the College will continue to treat his sepa-

ration from employment as a voluntary resignation and that he will be entitled to continue to receive the benefits which he negotiated in June, 1992, prior to his submitting his letter of resignation.

On May 28, 1993, the plaintiff wrote to the EEOC stating that he must "regretfully withdraw my charge of age discrimination," but asking the EEOC to "[p]lease hold actual implementation of withdrawal until you hear from me." On June 21, 1993, the EEOC sent plaintiff a letter, stating that the EEOC had terminated the processing of his charge. Counsel for the College forwarded to plaintiff's counsel a letter dated June 29, 1992, enclosing a form "Release" of legal claims, to which plaintiff never responded. On September 17, 1993, plaintiff filed the within age discrimination suit in this federal district court, alleging that defendant violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* in terminating plaintiff on the basis of age.[2] Defendant filed counterclaims against plaintiff on October 14, 1993, alleging breach of contract and seeking a declaratory judgment to that effect.

At this time, this Court must address three issues: (1) whether Blistein waived his right to bring a discrimination suit against defendant by accepting benefits from defendant at the time of his resignation; (2) whether Blistein has proved the existence of relevant and material disputed issues of fact with regard to the merits of his ADEA claim; and (3) whether the College unlawfully retaliated against the plaintiff when defendant filed a counterclaim alleging that plaintiff had waived his right to bring suit against the defendant. Each issue will be considered in turn.

## WAIRER

As an affirmative defense and counterclaim, the College alleges that Blistein

waived his right to bring suit under the ADEA either in June 1992, when he resigned and negotiated benefits from the College, or as a result of the May 1993 letter sent by Blistein's former attorney to the College. The College seeks summary judgment with regard to the waiver issue, or in the alternative, a declaratory judgment from the Court directing (1) that the College may cease to provide plaintiff with any benefits he would not have received but for the parties' 1992 and 1993 "agreements"; and (2) that plaintiff must compensate the College for the value of the aforementioned benefits. Both the College and Blistein move for summary judgment with regard to the waiver issue.

Effective October 16, 1990, the ADEA was amended by the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f). The OWBPA limits "the manner in which an employee may waive the protections afforded under federal law." *Oberg v. Allied Van Lines, Inc.*, 11 F.3d 679, 682 (7th Cir.1993).[3] The OWBPA provides in relevant part:

(1) An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary. Except as provided in paragraph (2), waiver may not be considered knowing and voluntary unless at a minimum—

(A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;

(B) the waiver specifically refers to rights or claims arising under this chapter;

(C) the individual does not waive rights or claims that may arise after the date the waiver is executed;

(D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;

---

**2.** For the reasons set forth in this Court's April 21, 1994, Memorandum and Order, plaintiff exhausted his administrative remedies prior to the filing of this case.

**3.** Prior to enactment of the OWBPA, courts used either contract principles or a "totality of the circumstances" test to evaluate the validity of an

alleged waiver of any ADEA claims. *See, e.g., O'Shea v. Commercial Credit Corp.*, 930 F.2d 358, 361–62 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 177, 116 L.Ed.2d 139 (1991) (listing courts which have endorsed those two approaches).

(E) the individual is advised in writing to consult with an attorney prior to executing the agreement;

(F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or . . . .

(G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired.

Under the OWBPA, enacted to ensure that "older workers are not coerced or manipulated into waiving their rights to seek legal relief under the ADEA," S.Rep. No. 101–263, 101st Cong., 2nd Sess. 5 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1510, it is clear that neither the 1992 or 1993 so-called "agreements" satisfy the OWBPA. As to the 1992 list of benefits signed by the College and Blistein, not only was the ADEA never mentioned in the document itself, but there is also no evidence in the record that any party discussed releasing the College from any potential legal claims. In fact, in his deposition, Fred Billups, the College Treasurer, states that at the time of Blistein's departure he never specifically discussed any potential legal claims against the College with Blistein. Moreover, Blistein was not given the requisite 21 days to consider the list before signing it; nor did the College inform Blistein that he could revoke his signature within seven days. Thus, the alleged "waiver" fails to meet the requirements of subsections of 626(f).

The May 1993 letter sent by Blistein's former counsel to counsel for the College also fails to satisfy the requirements of the OWBPA. That letter does not state that Blistein is waiving any rights he possesses under the ADEA as subsection (B) requires. Rather, that letter states that Blistein is withdrawing his charge of discrimination in the light of recent Supreme Court caselaw and that the College will "treat his separation from the employment as a voluntary resignation and that he will be entitled to continue to receive the benefits which he

negotiated in June, 1992. . . ." Such language does arguably give rise to an inference that Blistein withdrew his charge in order to continue receipt of benefits; however, such withdrawal does not constitute a waiver under subsection (B).[4] Further, it is doubtful whether an attorney may sign a waiver document which binds a client, given that the statute itself differentiates between an "individual," who must make the agreement with the employer, and an "attorney," who must be consulted before any waiver becomes final. In addition, Blistein was not given the requisite seven days to consider the waiver as required by subsection (G). The College urges this Court to ignore the requirement of subsection (G) in the light of the fact that Blistein was represented by private counsel and had personally negotiated the retirement package. However, the statute requires adherence to each of its separate requirements in the light of the congressional judgment that the statute's "degree of clarity and specificity increases the chances that individuals will know their rights upon execution of a waiver." S.Rep. No. 101–263, 101st Cong., 2nd Sess. 32 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1538. Finally, this Court notes that apparently even the College did not view the May 1993 letter as a waiver sufficient to satisfy the OWBPA because the College subsequently sent to Blistein for his signature a document entitled a "Release," purporting to release the College from any of Blistein's legal claims. It is to be noted that Blistein never signed that release.

■ The College argues that even if the 1992 and 1993 communications do not satisfy the OWBPA, then nevertheless, Blistein's subsequent acceptance of the negotiated benefits has ratified those imperfect "agreements." The College relies primarily on *O'Shea v. Commercial Credit Corp.*, 930 F.2d 358 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 177, 116 L.Ed.2d 139, a case decided prior to enactment of the OWBPA. In *O'Shea*, the plaintiff signed a release which stated that "O'Shea would agree to release any claims she might have against her employer in exchange for certain sever-

---

4. In the Memorandum and Order dated April 21, 1994, this Court held that plaintiff's withdrawal of his EEOC charge does not preclude the within suit. *See* Appendix A, attached to this opinion.

ance benefits." *Id.* at 359. Subsequently, the plaintiff filed a suit under the ADEA which the defendant-employer opposed on the grounds that plaintiff had waived any age discrimination claims against the defendant by signing a release and thereafter accepting benefits. The Fourth Circuit held, applying "ordinary contract principles," that plaintiff had knowingly and voluntarily waived any age discrimination claims against the defendant, despite plaintiff's claims of economic duress and fraud. *Id.* at 362. Alternatively, the Fourth Circuit held that even if the release was not valid, plaintiff's acceptance of the severance benefits operated to ratify the agreement. "It is a well-established proposition that the retention of the benefits of a voidable contract may constitute ratification." *Id.* (citations omitted).[5] The Fourth Circuit stated that the plaintiff could not "have it both ways," ie., accepting lucrative benefits while at the same time suing the employer. *Id.* at 363.

Presently, the circuits are split with regard to whether the doctrine of ratification of waiver agreements, as set forth in *O'Shea,* survives enactment of the OWBPA. *Compare Wamsley v. Champlin Refining and Chemicals, Inc.,* 11 F.3d 534 (5th Cir.1993) (plaintiff's subsequent acceptance of benefits ratified voidable release) *with Oberg v. Allied Van Lines, Inc.,* 11 F.3d 679 (7th Cir.1993) (plaintiff-employee does not ratify voidable release through acceptance of benefits). The Fourth Circuit has not yet addressed the issue. Although the College urges that the Fourth Circuit's holding in *O'Shea* is binding upon this Court, this Court notes that the Fourth Circuit explicitly stated in *O'Shea* that it was dealing with a field of law in which Congress has "done no more than leave the law in its nascent state." 930 F.2d at 361. Now that "Congress has occupied this area of the law through the enactment of the OWBPA," *Oberg,* at 683, it seems likely

that the Fourth Circuit would reconsider its prior holdings in *O'Shea.*

In *Oberg,* the Seventh Circuit reasoned that Congress' enactment of the OWBPA has displaced the common law doctrine of ratification. "In interpreting the requirements of the OWBPA we assume that the statute's operative words carry the plain meaning within their context. Under OWBPA, unless a waiver contract takes the form required by the statute, an employer and an employee cannot contract to waive the ADEA provisions." 11 F.3d at 683 (citing *Forbus v. Sears, Roebuck & Co.,* 958 F.2d 1036 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 412, 121 L.Ed.2d 336 (1992); *Isaacs v. Caterpillar, Inc.,* 765 F.Supp. 1359 (C.D.Ill.1991)). The Seventh Circuit in *Oberg* thus read literally the statute's mandate that an "individual may not waive," his or her rights under the ADEA without meeting the OWBPA's detailed requirements.

In contrast, the Fifth Circuit held in *Wamsley* that the ratification doctrine did survive enactment of the OWBPA, concluding that a waiver agreement which does not meet the requirements of § 626(f) is voidable, rather than void. 11 F.3d at 539. The Fifth Circuit reasoned that the traditional bases for voidable contracts (those would appear to be fraud, duress, coercion or mistake of fact), are similar to those circumstances against which Congress sought to protect older workers. Further, the Fifth Circuit stated that a contrary interpretation would be inconsistent with one of the goals of the ADEA—"'to help employers and workers find ways of meeting problems arising from the impact of age on employment.'" *Id.* at 539 (quoting 29 U.S.C. § 621(b)). According to the court in *Wamsley,* ratification permits private resolution of ADEA disputes without the costs associated with litigation.

---

5.   A contract is voidable if there exist grounds upon which a party can avoid or disaffirm, his duty of performance. Such grounds have traditionally included fraud, duress, mistake, and infancy.... To say that a contract is voidable, therefore, is to say that an antecedent promise created a legal duty on the promisor's part and that the promisor has the power either to avoid performance, based on any one of the several grounds of avoidance, or to ratify the promise by making a new one.
   Promises that are void cannot be ratified. The reason for this is simple: Void promises are not legally binding and thus, are not contracts.
   *Wamsley v. Champlin Refining and Chemicals, Inc.,* 11 F.3d 534, 538–39 (5th Cir.1993) (citing Restatement (Second) of Contracts § 7 (1981)).

Before deciding which circuit to follow, this Court notes preliminarily that the releases at issue in *O'Shea, Wamsley,* and *Oberg* all contained specific language releasing the employers from age discrimination suits in exchange for certain benefits. The alleged "agreements" in the instant case do not contain even that basic element. Thus, it is not clear that any of those courts would even reach the ratification issue in the instant case. For instance, the court in *Wamsley* might, in circumstances similar to those in this case, find that there never was an agreement—voidable or void—to begin with. Assuming for present purposes that there is an "agreement" in this case which could be ratified, this Court chooses to follow the line of reasoning set forth in *Oberg.* The court in *Wamsley* stresses the value of "giv[ing] effect to private agreements." 11 F.3d at 539. However, in the OWBPA, Congress was trying to protect older workers from private agreements which were unduly coercive. Permitting subsequent ratification of those agreements undermines the very purposes which the OWBPA sought to achieve. Thus, the *Oberg* decision, in this Court's view, gives more credence to the underlying purposes and the explicit language of the OWBPA. Accordingly, this Court holds that Blistein did not waive his rights to sue under the ADEA.

## AGE DISCRIMINATION

Because this Court has determined that Blistein did not waive his right to bring an ADEA suit against defendant, this Court must now proceed to address the merits of plaintiff's ADEA claim. For the reasons explained *infra,* defendant's motion for summary judgment will be granted.

■ In a claim of age discrimination, "plaintiff must prove that 'but for' his employer's discriminatory intent, he would not have been fired or laid off." *Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231, 233 (4th Cir.1991) (citing *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 238 (4th Cir. 1982)). Plaintiff may discharge that burden through "direct or indirect proof, or by invoking the Title VII *McDonnell Douglas* scheme of proof." *Id.* at 233–34 (citations

omitted). The burden-shifting method of proof was originally set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and " 'later adapted to age discrimination claims under the ADEA.' " *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1122 (7th Cir.1994) (quoting *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 371 (7th Cir.1992)).

■ First, to make a prima facie showing of age discrimination, plaintiff must demonstrate (a) that he was "in the protected age group," (b) that he "was discharged or demoted," (c) that at the time of this discharge or demotion, he "was performing his job at a level that met his employer's legitimate expectations," and (d) that "following his discharge or demotion, [he] was replaced by someone of comparable qualifications outside the protected class." *E.E.O.C. v. Western Elec. Co., Inc.,* 713 F.2d 1011, 1014 (4th Cir.1983) (citations omitted). Second, once plaintiff has established a prima facie case, the burden shifts to the employer who "must present a legitimate, non-discriminatory reason" for the action; and finally, plaintiff then bears the burden of showing that the "articulated reason was pretext." *Conkwright,* 933 F.2d at 234–35.

In this case, Blistein alleges that he was wrongfully terminated by the College because of his age, while the College asserts that the artist-in-residence position was eliminated for financial reasons. The College does not dispute that Blistein has satisfied two of the requirements needed to establish a prima facie case: he is within the age class of individuals protected by the ADEA, ie., he is over forty, and he was performing his job at a level which met with the College's expectations. However, the parties dispute whether plaintiff satisfies the two remaining prima facie requirements.

■ First, the parties dispute whether Blistein was discharged or whether he voluntarily resigned. Blistein claims that, in a meeting with the school's treasurer, Fred Billups, it was emphasized that if Blistein left the College's employ before June 30, 1992, he would be eligible to receive health care benefits, but that if he continued to work until his

position was officially terminated on December 30, 1992, he would receive no health care benefits for his retirement.[6] Thus, Blistein asserts that he essentially had no choice but to resign in order to meet the new eligibility requirements for retiree health benefits. In response, the College points to the June 12, 1992, letter in which Blistein listed the items he was requesting to assist him in his departure.[7] The College believes that the list demonstrates that Blistein left voluntarily after negotiating a lucrative set of benefits. Also, the College points out that Blistein gave the College a hand-written letter stating that he was resigning as of June 30, 1992.

■ This Court concludes that the College put Blistein in a position such that plaintiff felt compelled to resign, and that accordingly, Blistein was constructively discharged from the College. "A constructive discharge occurs when 'an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.' " *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986) (citations omitted). Intolerable working conditions can occur when an employee is given no choice but to resign. "[A] plaintiff who has accepted an employer's offer to retire can be said to have been constructively discharged when the offer presented was, at rock bottom, 'a choice between early retirement with benefits or discharge without ben-

efits,' or more starkly still, an 'impermissible take-it-or-leave-it choice between retirement or discharge.' " *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 480 (1st Cir.1993) (quoting *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1113 (1st Cir.1989)).[8] Because plaintiff would have been discharged had he not chosen to retire, this Court concludes that defendant "specifically *intended* to force [plaintiff] to quit," *EEOC v. Clay Printing Co.*, 955 F.2d 936, 944 (4th Cir.1992), and that therefore, defendant's actions were deliberate.[9]

Although plaintiff can meet three of the four prima facie elements, he is unable to satisfy the requirement that plaintiff was replaced by someone of comparable qualifications outside the protected class. In reduction in force cases, that element "may be satisfied by showing 'that persons outside the protected age class were retained in the same position or that there was some other evidence indicating that the employer did not treat age neutrally in deciding to dismiss the plaintiff.' " *EEOC v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992) (citations omitted). Plaintiff cannot show that persons outside the protected age class were retained in the position of artist-in-residence, as he concedes that that position has been abolished. Further, at least two of the persons who have taken over some of Blistein's former duties are in their 50s, and another is in his 40s, and those persons are therefore not outside the protected age class. Regardless,

6. The College's retiree health policy was to be changed as of July 1, 1992. After that date, one had to be at least 65 years old with 10 years of service or 55 years old with 30 years of service to be eligible for retiree health benefits. It would have been impossible for plaintiff to have met those new eligibility requirements prior to the termination of his position on December 30, 1992. Plaintiff was born on September 9, 1930, and was 61 at the time of his termination.

7. This letter asked for four months pay, medical benefits for plaintiff and his children, tuition reimbursements for his children, and smaller additional items of various expense.

8. *See also* 3A *Arthur Larson and Lex K. Larson, Employment Discrimination* § 99.32(b), at 21–87 (1994) ("[C]onstructive discharge in violation of the ADEA has been found to have occurred.... if the employer threatens loss of retirement benefits if early retirement is not taken."). *Cf. Martin v.*

*Bethlehem Steel Corp.*, 48 Fair Empl.Prac.Cas. 371, 1988 WL 110459 (D.Md.1988) (no constructive discharge where plaintiff given a choice between retiring early and receiving an additional five percent to his pension plan or maintaining his employment with his current salary and benefits). The *Martin* case was decided before *Clay Printing*.

9. However, as discussed *infra*, this Court does not find that the constructive discharge violated the ADEA because it did not occur for age-related reasons. This Court recognizes that some cases, such as *Vega*, require that constructive discharge must occur for age-related reasons, *see* 3 F.3d at 480. Since a requirement of age-related motivation serves to establish that the plaintiff was constructively discharged *in violation of the ADEA*, the defendant in the within case is not precluded from coming forth with a legitimate, non-discriminatory reason for that discharge.

Blistein may also satisfy the fourth prima facie requirement if he can demonstrate that the College did not treat age neutrally in constructively discharging him. This Court concludes that Blistein has failed to so demonstrate. The persons who took over plaintiff's former job duties worked on a contract basis. At the time of his June 1992 resignation, the College offered Blistein a job teaching visual arts classes on a contract basis which plaintiff turned down because the pay was too law. A young woman in her 20s who later performed some of plaintiff's job duties was offered that job on a contract basis only *after* plaintiff turned it down.[10] The College's job offer supports the College's position that it dismissed plaintiff for business reasons, and not on the basis of age. After all, if the College terminated Blistein because he was too old, it would make no sense for the College to offer Blistein an alternative position doing similar work at a lower cost to the College. Moreover, contract workers for defendant in the fine arts department range in age from 20s to 70s, indicating further that as to non-essential positions, defendant did not and does not discriminate on the basis of age.

Even if this Court were to hold that Blistein has satisfied the elements of a prima facie case, this Court concludes that the College has demonstrated a non-discriminatory reason for constructively discharging him. "The employer is not required to prove absence of discriminatory motive, but merely articulate some legitimate reason for its action." *Western Electric*, 713 F.2d at 1014. In this case, the College asserts that Blistein's position was abolished because it was not essential to the school's curriculum and cost too much for the College in the light of the College's financial difficulties. When President Nelson took office in 1991, the College had uncollected receivables of over $600,000, had suffered a $319,000 deficit during the fiscal year ending June 1991, and had an unbalanced budget for the 1991/1992 fiscal year of about $500,000. Moreover, the College was concerned that it was drawing too heavily on its endowment. President Nelson asked Treasurer Billups for recommendations as to how the College could "cut and trim" the budget for each and every department. The cost-cutting measures which were eventually implemented included freezing the base salaries of faculty; tightening up sick leave, short-term disability, and vacation policies; cutting 4% of all departmental budgets; placing a hiring freeze into effect; eliminating funds for staff educational programs; and declining to replace several employees who took early retirement. In June 1992 President Nelson himself decided to eliminate the plaintiff's position as one of these measures on the recommendation of Dean Brann and Treasurer Billups. With Blistein as artist-in-residence, the visual arts program cost the College $64,000 per year, much of that consisting of Blistein's salary and benefits. Now, however, the College is offering its visual arts program at a cost of only $8,000 per year.

Firing an employee solely because his salary is too high would not appear to violate the ADEA under the Supreme Court's reasoning in *Hazen Paper Co. v. Biggins,* —— U.S. ——, ——, 113 S.Ct. 1701, 1703, 123 L.Ed.2d 338, 343 (1993). In *Hazen Paper,* the Supreme Court held that the decision to fire an employee, solely because his pension was close to vesting, did not constitute discriminatory treatment on the basis of age, although it might constitute a violation of the Employee Retirement Income Security Act of 1974 (ERISA). *Id.* —— U.S. at ——, 113 S.Ct. at 1707, 123 L.Ed.2d at 348. In an attempt to clarify the "standards for liability" under the ADEA, *id.* —— U.S. at ——, 113 S.Ct. at 1704, 123 L.Ed.2d at 344, the Supreme Court stated that "there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." *Id.* —— U.S. at ——, 113 S.Ct. at 1705, 123 L.Ed.2d at 346. Rather, the Supreme Court emphasized that the ADEA protects against the firing of older employees "because the employer believes that productivity and competence decline with old age.... Congress'

---

10. That employee, a woman in her 20s, has subsequently left the employ of the College, and the College has not hired anyone to teach her classes, which consisted of sculpture and figure drawing—classes previously taught by Blistein.

promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." *Id.* — U.S. at ——, 113 S.Ct. at 1706, 123 L.Ed.2d at 347. The ADEA is not violated when "the motivating factor is correlated with age, as pension status typically is." *Id.* The same analysis applies to an employee who is fired because his salary is too high, because salary, like pension status, is often linked to seniority.

On average, an older employee has had more years in the work force than a younger employee, and thus may well have accumulated more years of service with a particular employer. Yet an employee's age is analytically distinct from his years of service. . . . Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.' *Id.* — U.S. at —— – ——, 113 S.Ct. at 1707, 123 L.Ed.2d at 347–48. *See also Schibursky v. IBM Corp.,* 820 F.Supp. 1169, 1177 (D.Minn.1993) (under *Hazen Paper,* "[t]he firing of an employee to save salary costs resulting from seniority . . . does not violate the ADEA"). In his deposition, plaintiff acknowledged that no one at the College had ever said anything to him indicating that he was too old to do his job. When asked if anyone ever said anything to him that "would immediately bring the concept of age to one's mind," plaintiff responded that "salary immediately brought the concept of age to my mind." However, in the light of *Hazen Paper,* a salary-based decision, even if it correlates with years of service and/or age cannot be a basis for an ADEA suit.

Although the defendant has, in this Court's view, alleged a legitimate, non-discriminatory reason for firing plaintiff, plaintiff may attempt to show that defendant's proffered explanation is mere pretext for its real decision to fire plaintiff because of his age. "To establish pretext, a plaintiff must prove that the defendant's explanation is unworthy of credence or that it is more likely that a discriminatory reason motivated the employer's actions." *Pfeifer v. Lever Bros. Co.,* 693 F.Supp. 358, 365 (D.Md.1987), *aff'd,* 850 F.2d 689 (4th Cir.1988) (citations omitted). Plaintiff sets forth numerous arguments which he claims demonstrate pretext.

*First,* plaintiff argues that his position was essential because the College has "younger, less-expensive employees" performing many of his former duties. However, that those employees cost less than plaintiff bolsters defendant's argument that it cut the full-time position for financial reasons, and not because it harbored stereotypical views of older employees such as Blistein. Because no degree is offered in the fine arts department and there are no course requirements in that area, there is no valid argument that an artist-in-residence is essential to the College. Moreover, the young woman in her 20s who taught sculpture and figure-drawing after Blistein was terminated has since left the College and has not been replaced—demonstrating further that the College does not treat visual arts as essential components of the College curriculum. Even if, as plaintiff contends, his former job duties are considered essential, the fact that the College offered Blistein a position teaching fine arts under contract negates any inference of age discrimination in that regard.[11]

*Second,* Blistein argues that another, younger employee of the College in a non-essential position, the Director of Athletics, was not terminated. However, "[i]t is not for this court . . . to direct the business practices of any company." *Clay,* 955 F.2d at 946; *see also Pfeifer,* 693 F.Supp. at 364 (D.Md.1987) (quoting *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1223 (7th Cir.1980)) ("[t]he ADEA is 'not intended as a vehicle for judicial review of business decisions.' "). That the College chose to preserve athletic activities at the cost of some visual arts offerings does not raise an inference that age was the motivating factor for that choice.

11. Accordingly, plaintiff's arguments that his position is essential because the Santa Fe campus of St. John's College has a visual arts requirement and because the Annapolis campus may be considering in the future whether to have some visual arts requirement in the graduate school curriculum lack merit.

The unrefuted deposition testimony of Dean Brann shows that the athletic activities offered at the College were more popular with students than the fine arts offerings, and that the College therefore considered it important to maintain its full athletic program. In any event, the Director of Athletics is over 40, and is therefore, like plaintiff, within the ADEA protected age group, indicating further that the College was not searching through various departments seeking only to cut older employees.

*Third,* Blistein argues that at the time he was forced to resign in July 1992, the College's budget was sound, and in fact, had a surplus of $32,000. Moreover, plaintiff contends that when the college faced its $319,000 deficit at the end of the academic year 1990/1991, the college did not involuntarily terminate a single employee. However, the $32,000 surplus would not appear to have eliminated the prior year's deficit, nor the long-term endowment problems the College was facing. The cost-cutting measures which began in 1991 continued into 1992 as part of an overall plan of cost-reduction. After the so-called 1992 surplus, there is no evidence that the College put an end to cost-cutting measures. Rather, it appears that the College has continued making cuts where possible, and even in 1992, the "surplus" year, the College declined to replace persons who had taken early retirement for financial reasons. Plaintiff himself states that the College was considering abolishing his position at least six months before he was terminated—which would place such decision-making long before any $32,000 surplus was realized. In any event, defendant has stated that elimination of plaintiff's position was meant to bring about financial benefits in the long-run, not merely to balance the 1992 budget. Also, the financial picture of the College appears to have brightened in 1992 only because of the cost-cutting measures it began in 1991 and has continued into the present.

Plaintiff also points to several Associate Faculty members whose salaries fell below the minimum service salary required by the Hay Study—a compensation study conducted at the College which established pay ranges for each of the College's non-teaching positions. At least three of the associate faculty members whose salaries were below the minimums set by the Hay study had their salaries increased as of July 1, 1992, to bring them in line with the study's recommendations.[12] In a letter from Billups sent to those employees, Billups stated that the raises were being given earlier than anticipated "because the College had the resources to make the adjustments." However, implementation of the Hay Study[13] was part of the financial restructuring the College was undertaking and does not evidence age discrimination, especially given that two of the employees who received raises were, like plaintiff, over sixty. Thus, such implementation is not inconsistent with the College's decision to abolish a non-essential position and thereby to save costs.

Plaintiff alleges that the cost savings resulting from his termination have been only nominal, pointing out that the budget for the art studio for the fiscal year 1992/1993 was only $15,492 less than it was for the previous year, and far from the $56,000 in expected savings. However, the savings were not large in 1992/1993 because approximately half of the budget in that year ($23,112), represented payments to plaintiff for severance and vacation pay. In 1993/1994, the College has reduced expenses from $63,182 to $12,345—indicating the substantial cost savings of eliminating the artist-in-residence position.

*Fourth,* Blistein contends that several comments by Dean Brann evidence age discrimination. These include her comment that "there was a fear that had the College not forced Blistein to resign might stay on and on," as well as her comment that plaintiff was "in effect, deadwood."[14] Such com-

---

**12.** Defendant is only three years older than two of those employees, the librarian and the registrar, both of whom were born in 1933. Plaintiff was born on September 9, 1930.

**13.** That study established a pay range for the artist-in-residence position that was lower than Blistein's actual rate of pay.

**14.** The "deadwood" comment was allegedly made by Dean Brann to John Verdi, Director of

ments appear to this Court to be consistent with the College's financial considerations, as they express a fear that plaintiff's high salary, in a non-essential position, was draining the College's resources.

*Fifth,* Blistein asserts that he received contradictory explanations of why he was fired from which a jury could infer that the College's proffered legitimate, non-discriminatory reasons are pretextual. According to plaintiff, at the time of his termination, Billups told him he was being fired for financial reasons, while Brann told him three months later that in addition to the financial reasons for his termination, "the timing of [his] termination was part of a deliberate effort to avoid a confrontation with [him], with the faculty, and with the students regarding [his] termination." Dean Brann also allegedly made several comments questioning Blistein's competence and also indicating that Blistein's position was not part of the required curriculum at the College. At the same time, Dean Brann again offered plaintiff a contract position leading visual arts seminars for undergraduates. The comments made by Dean Brann regarding timing of his termination and the non-essential nature of his position do not contradict the College's proffered non-discriminatory reasons and lack of age discrimination motivation. The unrefuted deposition testimony of the College officials reveals that Blistein's position was terminated at the decision of President Nelson, who relied on the recommendations of Billups and Brann with regard to the nature and cost of the position. Neither Nelson nor Billups have represented that they got rid of Blistein for any reason other than a financial one, and both have asserted that Blistein was highly competent. Any comments by Dean Brann regarding Blistein's competence may have expressed her personal views, but they were apparently not relied on by President Nelson, the ultimate decision-maker, or by Billups. Moreover, the fact that the Dean then offered

Blistein a contract position indicates that she did not find him incompetent. Accordingly, this Court does not believe that defendant's explanations were inconsistent.

*Sixth,* plaintiff alleges a pattern of age discrimination because he was removed from his position as art gallery director in 1990 and replaced with a younger individual. However, defendant offers several legitimate reasons why plaintiff was removed from that position, including the fact that Blistein complained that he was overburdened with work, that he had difficulties with the gallery secretary, that his handling of the gallery was inefficient, and that there was criticism of plaintiff's work in cataloging at the gallery. When he was advised of the change in his duties, plaintiff allegedly seemed pleased to have the time to produce more works of art. Plaintiff apparently believes that those reasons are pretextual and are part of a pattern of discrimination which culminated in his termination as artist-in-residence. However, because this Court has not found pretext for his termination, there is no "pattern" of discrimination established as a result of the earlier removal.[15]

*Seventh,* plaintiff states that the he was the oldest associate faculty member and the only employee whose salary exceeded the maximum salary range established by the Hay Study to be terminated. However, plaintiff's argument of pretext in this regard ignores the fact that the College abolished his position not only because it would save money, but also because his position was non-essential to the curriculum at the College. Moreover, two of the current associate faculty members, the Librarian and the Registrar, are within three years of age of Blistein. Finally, it appears that, contrary to plaintiff's assertion, there were two college employees who were older than plaintiff whose salaries also exceeded the Hay guidelines. Plaintiff is correct that he was the

---

the Graduate Institute, who then repeated it to plaintiff. However, in his deposition, Verdi stated that "the term luxury was used, that is the artist-in-residence position was for the College a luxury that it would not afford at this time, but I don't recall that Miss Brann used that expression in effect deadwood."

**15.** It should be noted that plaintiff never complained prior to his initiation of this case or brought a charge of discrimination with regard to the change in his duties as artist-in-residence.

only person whose salary exceeded the Hay Study to be terminated, but the fact that employees older than him, whose salaries also exceeded the Hay Study, were not terminated would appear to cut against plaintiff's claim of age discrimination.

Thus, while Blistein has compiled a lengthy list of reasons why the defendant's explanation is pretext, a reasonable jury, in this Court's view, could not infer discrimination from any of them. Each and every one of those factors is explained by non-discriminatory motivations and does not raise disputed issues of material fact which should be submitted to a jury.

### RETALIATION

■ Blistein alleges that under the ADEA, the College has committed unlawful retaliation and abuse of process by filing its counterclaim alleging breach of contract, promissory estoppel and declaratory judgment, concerning Blistein's alleged waiver of his right to file suit as a result of the retirement agreement reached between the two parties.

Under the ADEA,

"It shall be unlawful for an employer to discriminate against any of his employees ... because such individual ... has opposed any practice made unlawful by this section, or because such individual ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."

29 U.S.C. § 623(d).

■ Under *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), a prima facie case of retaliation is made out by an employee who can show (1) that he was "engaged in protected activity;" (2) that the "employer took adverse employment action against" him; and (3) that there is "a causal connection" between the first two requirements.[16] Additionally, "[a] plaintiff need not establish the validity of the original complaint in order to establish a prima facie case of retaliation for having made the original charge." *Kralowec v. Prince George's County, Md.*, 503 F.Supp. 985, 1008 (D.Md. 1980), aff'd, 679 F.2d 883 (4th Cir.1982), *cert. denied*, 459 U.S. 872, 103 S.Ct. 159, 74 L.Ed.2d 132 (1982), (citing *United States v. University of Maryland*, 438 F.Supp. 742, 758 (D.Md.1977)).

■ Blistein, by filing an age discrimination in a timely manner, has engaged in a protected activity. In addition, the College has taken an adverse action against the plaintiff. Although that action is not strictly employment related, "the retaliatory action complained of need not be an employment action." 3A *Larson* § 99.70, at 21–101. "As the D.C. Circuit stated in *Passer*, [the ADEA] 'does not limit its reach only to acts of retaliation that take the form of cognizable employment actions such as discharge, transfer, or demotion.'" *Jensvold*, 829 F.Supp. at 140 (quoting *Passer*, 935 F.2d at 331)). Outside the workplace, "retaliatory conduct may take the form of unfavorable references or even legal action, such as a suit for libel for defamation or malicious prosecution." 3 *Larson* § 87.20, at 17–110. Finally, there is a causal connection between the College's filing of its counterclaim and Blistein's filing of his age discrimination suit. Indeed, the College would have no legal claim that Blistein was violating his agreement not to bring an ADEA suit until Blistein actually did so. Thus, plaintiff has satisfied a prima facie case of retaliation.

"Once a prima facie case has been presented, the employer then has the burden of producing a legitimate nondiscriminatory reason for the adverse action, thereby rebut-

---

**16.** Although *Ross* concerned an employment discrimination charge brought pursuant to Title VII, the non-retaliation provisions of Title VII and the ADEA are nearly identical; therefore this Court believes that the Title VII retaliation decisions of the Fourth Circuit are applicable. "Indeed, Title VII interpretations have sometimes been riled upon as guidance in ADEA decisions, and vice versa." 3A *Larson* § 98.32, at 21–13 (footnotes omitted). "[T]he ADEA anti-retaliation provision is 'parallel to the anti-retaliation provision contained in Title VII,' and [therefore], 'cases interpreting the latter provision are frequently relied upon in interpreting the former.'" *Jensvold v. Shalala*, 829 F.Supp. 131,140 n. 38 (D.Md.1993) (Legg, J.) (quoting *Passer v. American Chemical Soc.*, 935 F.2d 322, 330 (D.C.Cir.1991)).

ting the presumption of retaliation raised by the prima facie case." *Ross,* 759 F.2d at 365 (citation omitted). Defendant contends that it has not retaliated against Blistein because it has continued to provide him with the negotiated benefits and that pursuant to that agreement, the "College has every right to assert its position and recover monies improperly held by Plaintiff if, in fact, there is no agreement." Accordingly, defendant contends that it is merely asserting its legal rights in the face of plaintiff's alleged breach of contract.

■ Courts have found that the filing of defamation actions constitutes retaliation because of an "absolute privilege against defamation or other torts resulting from exercising a right granted by federal law like the filing of a charge of discrimination." *EEOC v. Virginia Carolina Veneer Corp.,* 495 F.Supp. 775, 778 (W.D.Va.1980) (citations omitted). The same is true with regard to employer suits for malicious prosecution in retaliation for an employee's filing of a charge of discrimination. *Cooper v. Pic Walsh Freight Co.,* 27 Fair Empl.Prac.Cas. (BNA) 344, 1976 WL 12 (E.D.Mo.1976); *see also Beckham v. Grand Affair of North Carolina Inc.,* 671 F.Supp. 415 (W.D.N.C.1987) (defendant not entitled to summary judgment on retaliation count where defendant had plaintiff arrested and prosecuted her for trespassing). However, because this case involves a breach of contract, rather than a tort, that principle would not appear to apply in the within case. Moreover, when an employer files a defamation claim in response to an employee's assertion of Title VII or ADEA rights, such employer is not asserting valid legal rights, because employees have unfettered rights to file discrimination suits—regardless of their merit. The within case however, involves a defendant asserting legal rights which arise, not from the filing of the discrimination charge itself, but rather from the breach of contract allegedly effectuated by that filing. Although this Court has ruled in favor of plaintiff with regard to defendant's breach of contract claims, this Court recognizes that that issue is one in which there is an existing circuit split. To disallow defendant from asserting its counterclaim would mean that defendant-employers in discrimination suits would be severely limited in protecting their rights under *proper* waiver agreements which comply with the OWBPA. For those reasons, this Court concludes that the within case does not fall within the line of cases which have found retaliation arising from the defendant's filing of a defamation or malicious prosecution suit.

"[I]f the employer produces a legitimate nondiscriminatory explanation, the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual." *Ross,* 759 F.2d at 365 (citation omitted). Plaintiff claims that the employer was on notice long before plaintiff filed this suit that plaintiff did not consider himself contractually bound to treat his departure as voluntary. Plaintiff claims that defendant had such notice when plaintiff filed for unemployment compensation. However, defendant is alleging a breach of contract not to bring a discrimination suit against defendant in return for certain benefits. That breach did not occur until Blistein filed the within suit. Moreover, after the unemployment compensation hearing, plaintiff's counsel wrote the College confirming that the alleged "agreement" was still in effect. The College, under those circumstances, would have no reason to conclude at that time that plaintiff would be filing a discrimination suit. Accordingly, plaintiff has not demonstrated pretext in the within case.

## CONCLUSION

Because the record establishes, in the present summary judgment context of this case, that defendant has not discriminated against plaintiff because of plaintiff's age, summary judgment will be entered for defendant.

### *APPENDIX A*

In the United States District Court for the District of Maryland

Civil No. K–93–2716.

Burton Blistein

v.

St. John's College

### *MEMORANDUM AND ORDER*

(1) Reference is hereby made to defendant's motion to dismiss, or in the alternative

for summary judgment based upon plaintiffs' withdrawal of his EEOC charge, filed January 25, 1994; plaintiff's opposition thereto filed, February 14, 1994; and defendant's reply, filed February 23, 1994. In a Memorandum to Counsel, dated March 31, 1994, this Court stated that, as agreed by Court and counsel, this Court would consider the administrative exhaustion question at issue in this case and then would discuss settlement possibilities with counsel. For the reasons stated herein, this Court concludes that plaintiff exhausted his administrative remedies and therefore, defendant's motion to dismiss with respect to that issue is DENIED. The other pending motions in this case [1] will be held *sub curia* per the March 30, 1994, agreement among this Court and counsel.

(2) [*See* the Facts as set forth in the body of the opinion *supra.*]

(3) In its motion to dismiss, defendant contends that plaintiff withdrew his charge of age discrimination from the EEOC prior to filing suit in federal court, and thereby failed to exhaust his administrative remedies under the ADEA, 29 U.S.C. § 626. That statute, in relevant part, states:

> (d) No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Opportunity Commission.

> (e) If a charge filed with the Commission under this chapter is dismissed or the proceedings of the Commission are otherwise terminated by the Commission, the Commission shall notify the person aggrieved. A civil action may be brought under this section by a person defined in section 630(a) of this title against the respondent named in the charge within 90 days after the date of the receipt of such notice.

Combined, these two provisions provide that "the window for filing an ADEA suit begins

sixty days after filing the EEOC charges and ends ninety days after receipt of the EEOC right to sue notice." *Adams v. Burlington Northern R.R.*, 838 F.Supp. 1461, 1468 (D.Kan.1993), *certification denied,* 843 F.Supp. 686 (1994). Plaintiff contends that he has satisfied the literal requirements of §§ 626(d) and (e), ie., he has waited 60 days after filing his EEOC charges before bringing his federal suit and he filed suit within 90 days of receipt of notice from the EEOC that "the proceedings of the Commission are otherwise terminated by the Commission." 29 U.S.C. § 626(e).

Defendant does not dispute that plaintiff timely filed his federal suit, but rather argues that by withdrawing his case from the EEOC, plaintiff waived his right to sue. However, defendant relies almost exclusively on ADEA cases involving the procedures governing federal employees and Title VII cases. Those cases, which address different statutory requirements and procedures, are "inapposite" in this case. *See Ingram v. Dallas County,* 688 F.Supp. 1146, 1159 (N.D.Tex.1988) (ADEA federal employee cases are "totally inapposite" to question of exhaustion involving private plaintiff); *Farber v. General Electric Co.,* 1994 WL 46519, *6 n. 5, 1994 U.S.Dist. LEXIS 1578, *9 n. 5 (E.D.Pa.1994) (same); *Adams,* 838 F.Supp. at 1468 (Title VII cases are dissimilar for purposes of determining exhaustion in ADEA context). Further, in the cases cited by defendant, withdrawal of the EEOC charge usually occurred *before* all the administrative prerequisites had been met. *See e.g., Castro v. United States,* 775 F.2d 399, 404 (1st Cir.1985) (ADEA government employee plaintiff withdrew his charge before statutorily mandated hearing was held); *Puckett v. Tennessee Eastman Co.,* 889 F.2d 1481, 1488 (6th Cir.1989) (Title VII plaintiff withdrew her charge before receiving statutorily mandated right to sue letter); *White v. Frank,* 718 F.Supp. 592, 596 (W.D.Tex.1989),

---

**1.** Defendant's motion for summary judgment, or in the alternative, declaratory judgment based upon plaintiff's retirement agreement and retention of benefits, filed February 24, 1994, and response and reply thereto; Plaintiff's motion for summary judgment, filed March 2, 1994; and response and reply thereto; Defendant's motion for summary judgment, filed March 3, 1994, and

response and reply thereto; and Plaintiff's motion to compel interrogatory responses and document production, filed March 3, 1994, and response and reply thereto; Plaintiff's motion in limine to bar defense of failure to mitigate damages, filed March 3, 1994, and response thereto; and Defendant's motion for leave to file amended answer, filed March 9, 1994.

*aff'd,* 895 F.2d 243, *cert. denied,* 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990) (ADEA government employee plaintiff filed his suit in court before administrative appeal was decided by the EEOC); *Rivera v. U.S. Postal Service,* 830 F.2d 1037 (9th Cir.1987) (Title VII plaintiff filed suit in Court before administrative appeal was decided).

In *Ingram,* an ADEA case involving a private plaintiff, the district court held that, plaintiff's withdrawal of his EEOC charge notwithstanding, where plaintiff filed suit after the 60 day time limit had expired, plaintiff had fully exhausted his remedies under the ADEA. 688 F.Supp. at 1158. In *Ingram,* as in this case, "the required 60 day waiting period had expired, and [plaintiff] could have filed this federal court action prior to withdrawing her claim from EEOC." *Id.* The court in *Ingram* reasoned that "once EEOC has failed after 60 days to achieve conciliation or take other action, maintenance of the charge with the agency serves little purpose." *Id.* at 1159. Accordingly, Judge Sanders held that "the ADEA complainant's right to file suit vests after the EEOC has had a 60 day opportunity to act on complainant's charge and is not divested by a subsequent withdrawal of the charge from the agency." *Id.* at 1159.[2]

As defendant notes, the purpose of the EEOC administrative process is to place an employer on notice of a discrimination charge and to give the EEOC the opportunity to resolve the dispute through investigation and conciliation. *Greene v. Whirlpool Corp.,* 708 F.2d 128, 130 (4th Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984). Both of those purposes have been met in this case—the EEOC had the statutory period of 60 days to attempt conciliation and the College was put on notice that a discrimination charge had been lodged against it. *See Ingram,* 688 F.Supp. at 1158–59. Although the College believed that the charge was withdrawn, plaintiff could file his suit at any time up to 90 days after his charge was dismissed by the EEOC. It is only after that time period ran that the College would have a valid defense of repose. Thus, assuming that plaintiff in fact withdrew his charge from the EEOC,[3] plaintiff has exhausted his administrative remedies under 29 U.S.C. § 626(d).[4]

(4) Counsel have stated that they would like to discuss settlement after this Court has decided the issue referred to *supra.* Accordingly, counsel are asked so to do and to let this Court by May 9, 1994, have one joint written status report concerning settlement and proposed future discovery if settlement is not in the cards.

(5) This Memorandum and Order is today being sent to counsel of record.

(6) It is so ORDERED this 21st day of April 1994.

/s/ _____

Senior United States District Judge

2. At the time *Ingram* was decided, the 90 time limit for plaintiffs to file in federal court after receiving notice from the EEOC was not in effect. That provision was enacted as part of the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071.

3. There is a dispute between the parties over whether plaintiff actually withdrew his charge from the EEOC. Plaintiff's May 28, 1993, letter asked the EEOC to hold in abeyance implementation of the withdrawal until further word from plaintiff. However, because this Court holds that plaintiff has exhausted his administrative remedies *even if* his actions constitute a withdrawal, this Court need not resolve that factual dispute.

4. To this Court's knowledge, the only other case involving a private plaintiff who withdrew an ADEA charge before filing federal suit is *Sobel v. Eastman Kodak Co.,* 1987 WL 14145, *2, 1987 U.S.Dist. LEXIS 6505, *5–6 (E.D.Pa.1987), in which the court determined that due to the withdrawal plaintiff failed to exhaust his administrative remedies. However, the summary conclusion in that case fails to recognize the line of reasoning set forth in *Ingram,* and for that reason, does not persuade this Court. Further, *Sobel* differs factually from the within case because the plaintiff in *Sobel* also failed timely to file with the EEOC his ADEA claim.