# UNITED STATES COURT OF APPEALS

## For the Fifth Circuit

No. 92-1743

ALLEN M. WAMSLEY, DONALD J. WHITTENBERG, ANTHONY J. NAGY, BETTY R. SANDERSON and GLENDA K. BENNETT,

Plaintiffs-Appellants,

VS.

CHAMPLIN REFINING AND CHEMICALS, INC., ET AL.,

Defendants,

CHAMPLIN REFINING AND CHEMICALS, INC., ET AL.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Texas

(December 30, 1993)

Before JONES and DeMOSS, Circuit Judges, and BARBOUR, District Judge[1].

DeMOSS, Circuit Judge:

We are called upon in this case to determine whether the waiver requirements of the Older Workers Benefit Protection Act[2] (the "OWBPA"), make our holding in Grillet v. Sears Roebuck & Co.,

_____

[1] Chief Judge of the Southern District of Mississippi, sitting by designation.

[2] Pub. L. No. 101-433, § 201, 104 Stat. 983 (1990) (amending the Age Discrimination in Employment Act at 29 U.S.C.A. § 626(f) (West Supp. 1993)).

927 F.2d 217 (5th Cir. 1991), unsound. Because we conclude that nothing in the text or the legislative history of the OWBPA evidences a congressional intent to disturb the common law principles to which our holding in Grillet is anchored, the district court's judgment is affirmed.

BACKGROUND

Appellants are former employees of Champlin Refining & Chemicals, Incorporated ("Champlin") or one of its predecessors-in-interest. In September of 1990, Champlin informed its Irving, Texas office employees that at the end of the year Champlin would become a wholly owned subsidiary of Citgo Petroleum Corporation. Champlin explained that as a result, the Irving office was to be closed and several of its employees were going to lose their jobs. Champlin also explained that it was initiating a "Termination Pay Plan" (the "Plan") for the benefit of those employees whose employment would be terminated. In October, Champlin circulated a copy of the Plan to all of its employees, including Appellants.

In November and December, Champlin informed Appellants that they were among the employees who were going to be "let go." Champlin provided them with a "Notice Pertaining to Release of Claims" document and a "Release of Claims" agreement.[3] The notice included the following provision:

---

[3]On November 7, Wamsley received the notice and release and was informed that he would be terminated on November 30; on November 15, Nagy received the notice and release and was told that his termination date was also on the 30th; on November 20, Whittenberg, Bennett, and Sanderson received the notice and release and were informed that their employment would be terminated on December 31.

2

Although you may execute the Release of Claims as soon as you wish, you also may take up to 45 days from your receipt of the Release of Claims to consider it. Your decision to execute the Release of Claims and accept benefits under the Termination Pay Plan will be revocable for seven days after execution, and no payment of termination pay will be made until that period has expired. Therefore, to be able to provide your termination pay to you not later than five business days after the termination of your employment, the Company must receive your executed Release of Claims at least seven days before that payment date.

The release provided for Appellants' waiver of any action or claim against Champlin and "its successors, assigns, [and] affiliates," "relating to or arising out of [their] employment with [Champlin] . . . or the termination of such employment, including but not limited to, claims for . . . age discrimination under . . . the Age Discrimination in Employment Act of 1967." The release made clear that the benefits to be paid under the Plan constituted the consideration for the release.

Each of the appellants executed a release, and in return, Champlin paid Appellants severance benefits.[4] It is undisputed that Appellants would not have otherwise been entitled to receive these benefits; such benefits were paid strictly as consideration for their release of Champlin.

---

[4]Wamsley executed on November 20 and received $84,369.13; Nagy executed on November 21 and received $90,763.01; Sanderson executed on November 27 and received $25,634.99; Bennett executed on December 19 and received $28,442.80; and Whittenberg executed on December 21 and received $54,000.00. In addition to cash, appellants received other benefits including outplacement services through 1991 and medical, dental and life insurance benefits for a period of six months.

3

In April of 1991, Wamsley, Whittenberg, Nagy, and Sanderson sent Champlin a letter threatening suit under the ADEA.[5]  Later that year, in May, each of the aforementioned appellants filed charges against Champlin for age discrimination with the Equal Employment Opportunity Commission.[6]  In January of 1992, their releases notwithstanding, Appellants filed suit against Champlin, Citgo and the Plan (collectively referred to as "Champlin") alleging that it had unlawfully discriminated against them on the basis of age when it terminated their employment and denied them certain benefits under the Plan.

They also alleged that their releases were "void or voidable" due to duress and Champlin's failure to comply with one of the conditions of the OWBPA.  Appellants contended that Champlin had failed to provide them 45 days to consider the release as required under the OWBPA, and thus, the releases were not "knowing and voluntary" within the meaning of the section 626(f)(1) of the ADEA.

Champlin answered the suit with a motion to dismiss.  It argued that the releases were valid under the OWBPA and relied on the above-quoted portion of the notice document as proof that Champlin had provided its employees the 45-day consideration period.  It also tendered affidavits specifically denying that Appellants were told to execute and return the release prior to the expiration of the 45-day period.  Champlin explained that it had

---

[5]Apparently Bennett had not thrown in with the other would-be-litigants at this time.

[6]Bennett filed her claim with the EEOC on December 30, 1991.

4

simply told its employees that they could avoid an interruption in payroll if they returned the executed releases before their termination date.

Champlin also averred that Appellants had not returned or offered to return the severance benefits they received as consideration for the releases. Thus, Champlin argued that even if the court was unable to determine as a matter of law that Champlin had provided the 45-day consideration period, the court should hold that Appellants had ratified the releases and dismiss their claims.

Appellants responded to Champlin's motion and proof by tendering affidavits in which each swore to facts surrounding their termination and execution of the release. Appellants claimed to have been told by certain individuals in the Champlin organization that they had to sign and return the release by their termination date, less than 45 days after receiving the notice, in order to receive benefits under the Plan.

On August 14, 1992, the district court granted Champlin judgment and dismissed Appellants' suit. The court held that the releases were knowing and voluntary within the meaning of the ADEA and, thus, barred Appellants' suit. The court alternatively held that even if the releases were not valid when executed, Appellants had ratified the agreements by failing to return to Champlin the benefits they had received as consideration after learning of the releases' alleged invalidity.

Appellants appeal, raising two general contentions. They argue first, that fact issues exist regarding the knowing and

5

voluntary nature of their releases. They also contend that the doctrine of ratification has no application in this suit. Although we agree with Appellants' first contention, we reject their second. The district court's judgment is, therefore, affirmed.

## DISCUSSION

### Knowing and Voluntary Waiver

Congress, through enactment of the OWBPA, has determined that employers must afford their employees the right to consider for 45 days whether they should waive any rights or claims *vis á vis* the ADEA in exchange for benefits under a group termination program. 29 U.S.C. § 626(f)(1)(F)(ii). Appellants contend, *inter alia*, that Champlin denied them this right. Champlin responds by arguing that it complied with the 45-day requirement and pointing to the "Notice Pertaining to Release of Claims" document as proof. Appellants counter by swearing that the information contained therein was orally countermanded by certain persons at Champlin. Champlin, of course, denies that Appellants were told anything of the sort.

Which version accurately describes Champlin's dealings with Appellants is an issue that cannot be resolved by the court through summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-55 (1986). We are unable to conclude, therefore, that Appellants' releases were "knowing and voluntary" under the ~~ADEA~~ OWBPA. Although we recognize that Appellants have managed to create a fact issue on this point, we consider the issue to be immaterial in light of our conclusion that Appellants have ratified their releases as a matter of law.

6

<u>Ratification of the Releases</u>

Appellants do not dispute that they have neither returned nor offered to return the benefits they received as consideration for the releases. Rather, Appellants argue that the law does not require them to make such a tender in order to pursue claims under the ADEA. In taking this position, Appellants press two arguments. They first contend that the OWBPA has effectively overruled our decision in <u>Grillet v. Sears, Roebuck & Company</u>. In <u>Grillet</u>, the court held that when an employee agrees to release her employer from liability under the ADEA and receives benefits as consideration for the agreement, the employee ratifies the agreement if she retains the consideration after learning that the release is voidable. 927 F.2d at 220. Appellants alternatively argue that <u>Grillet</u> was erroneously decided and should be overruled. We treat each argument in turn.

<u>The OWBPA and Ratification</u>

Appellants contend that "[t]he language and purpose of the OWBPA preclude ratification of a release otherwise in violation of the OWBPA." The language upon which Appellants rely states that an individual "<u>may not</u>" waive any ADEA claim unless the waiver is knowing and voluntary within the meaning of section 626(f)(1) of title 29. (emphasis Appellants') Appellants read this language to mean that any waiver failing to meet one of the requirements under section 626(f)(1) is not simply voidable, but void and, therefore, unable to be ratified.

The doctrine of contractual ratification is the enforcement of a promise to perform all or part of an antecedent contract of the promisor, previously voidable by him, but not avoided prior to the making of the promise. RESTATEMENT (SECOND) OF CONTRACTS § 85 (1981). To have ratification, there must be an antecedent contract that was previously voidable, but not avoided. A contract is voidable if there exist grounds upon which a party can avoid, or disaffirm, his duty of performance. Id. § 7. Such grounds have traditionally included fraud, duress, mistake and infancy. Id. § 7 cmt. b.

Ratification operates to allow a party having the power to avoid his contractual duty to make, or be deemed to have made, a new promise to perform his previously voidable duty and thus, extinguish his power of avoidance. Id. § 85 cmt. a. To say that a contract is voidable, therefore, is to say that an antecedent promise created a legal duty on the promisor's part and that the promisor has the power either to avoid performance, based on any one of the several grounds of avoidance, or to ratify the promise by making a new one.[7]

Promises that are void cannot be ratified. The reason for this is simple: Void promises are not legally binding and thus, are not contracts. Id. § 7 cmt. a. Without an antecedent contract to ratify, there can be no ratification. To say that a promise is void is to say that it created no legal obligation and that the

---

[7]Note that if the same grounds for avoidance exist when the new promise is made, the party again enjoys the power to avoid performance under the new promise. REST. CONT., § 85 cmt. b. Where, however, such grounds no longer exist, ratification mandates performance of the new promise.

8

promisor is without the power to bind himself under a new promise to perform the antecedent promise. Id. §§ 8 and 85 cmt. a.

We do not interpret the language of section 626(f)(1) to mean that a waiver which fails to meet the requirements of subsections (A) through (H) is void of legal effect. Rather, we interpret it to mean that such waivers are not knowing and voluntary and thus are subject to being avoided at the election of the employee. This interpretation comports with the language of section 626(f)(1) and is supported by the legislative history of the OWBPA.[8]

We also find that the provisions of section 626(f)(1) support our conclusion that defective waiver agreements are voidable and not void. Section 626(f)(1)(G) expressly provides that for seven days after execution of a waiver agreement an employee may revoke the agreement and that the agreement does not become enforceable until the expiration of the seven day revocation period. If non-compliance with the other subparts of section 626(f)(1) rendered the agreement void, there would be no need for subpart (G).

---

[8]The legislative history indicates that the fundamental purpose of the OWBPA waiver provisions is to ensure that an older worker who is asked to sign an ADEA waiver does so in the absence of fraud, duress, coercion, or mistake of material facts. S. REP. No. 101-263, 101st Cong., 2nd Sess. (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1537. The circumstances against which these provisions were designed to protect are the same circumstances that have traditionally given rise to grounds upon which a party can avoid contractual obligations. That the Committee enumerated several of the traditional grounds of avoidance is significant. Also significant is the absence of any language in the statute and any statement in the legislative history indicating that a waiver executed in contravention of the OWBPA requirements is void of legal effect and cannot be ratified by an employee.

9

Finally, an interpretation of section 626(f)(1) that renders defective waiver agreements void would be inconsistent with one of the expressed purposes of the ADEA: "to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). The simplest and easiest way to further this purpose is to give effect to private agreements which resolve age related employment problems without the inevitable delays and costs associated with litigation. Were employers forced to assume the risk that non-compliance with all of statutory requirements of section 626(f)(1) renders a waiver agreement for which they have paid valuable consideration void and thus, not capable of being ratified, clearly they would be disinclined to propose such solutions.[9]

Therefore, we hold that neither the language nor the purpose of the OWBPA indicates a congressional desire to deprive an

_____

[9]The facts before us testify to this truth. The Plan which Champlin circulated to Appellants in early October 1990 contained a provision materially identical to the waiver agreement that each of the appellants executed. Thus, two of the appellants had almost two months and the others had almost three months to consider the Plan and their waiver of rights under the ADEA. Nevertheless, after executing the agreements and accepting the termination benefits as the consideration for their promises not to sue, each of the appellants filed suit, claiming that the waiver agreements were not "knowing and voluntary." Although, Champlin's documentary evidence shows it to have been in letter perfect compliance with section 626(f)(1) and to have lived up to its end of the waiver bargain, the nature of Appellants' attack on the agreements assured Appellants of a fact issue with which to avoid summary judgment on this issue. Thus, were we to conclude that Appellants' waiver agreements were void from their execution, Champlin would be facing continued litigation with opponents who could use, and possibly already have used, to finance their suit, the very funds Champlin paid as consideration to avoid litigation.

employee of the ability to ratify a waiver that fails to meet the requirements of the OWBPA. When Appellants chose to retain and not tender back to Champlin the benefits paid them in consideration for their promise not to sue Champlin, they manifested their intention to be bound by the waivers and thus, made a new promise to abide by their terms.[10] Grillet, 927 F.2d at 220; O'Shea v. Commercial Credit Corp., 930 F.2d 358, 362 (4th Cir. 1991); In Re Boston Shipyard Corp., 886 F.2d 451, 455 (1st Cir. 1989); Anselmo v. Manufacturers Life Ins. Co., 771 F.2d 417, 420 (8th Cir. 1985). The court will enforce their new conduct based promises as it legally and equitably should.[11]

---

[10]A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made. REST. CONT. § 2. That a promise has been made can be determined from conduct as well as words. REST. CONT. § 19. Here the conduct giving rise to Appellants' promise to perform under their waivers was their retention of the consideration for their waivers. That Appellants may have subjectively intended something different is of no moment.

> In the final analysis, the objective theory of contracts, as distinguished from the subjective theory, is based on analogy to estoppel. This is apparent whenever a person is held bound by a contract because of his manifestations when his manifestations are contrary to his actual state of mind.

1 SAMUEL WILLISTON, WILLISTON ON CONTRACTS § 98, p. 362 (1957) (footnote omitted).

[11]Note that the court is not enforcing the promises contained in any of the allegedly voidable waiver agreements as such. What the court is enforcing is a new promise, evidenced by subsequent conduct, to be bound by the terms of the original waiver agreements. Therefore, that the original waiver agreements may not have been in compliance with § 626 is of no consequence. The court is now concerned with the enforcement of a new promise which gives rise to a new legal obligation. As a new promise that creates a new obligation, it is not subject to

11

<u>Grillet and Hoque</u>

Appellants alternatively argue that our decision in <u>Grillet</u> is contrary to the Supreme Court's decision in <u>Hoque v. Southern R. Co.</u>, 88 S.Ct 1150 (1968). We disagree.

In <u>Hoque</u>, the Court held that a "tender back" of consideration paid by a rail carrier to one of its injured employees in exchange for the employee's release was not a prerequisite to the employee bringing suit on the injury. <u>Id</u>. at 1151-5. The Court reasoned as follows:

> [A] rule which required a refund as a prerequisite to institution of suit would be wholly incongruous with the general policy of the [Federal Employers Liability Act] to give railroad employees a right to recover just compensation for injuries negligently inflicted by their employers. Rather it is more consistent with the objectives of the Act to hold, as we do, that it suffices that, except as the release may otherwise bar recovery, the sum paid shall be deducted from any award determined to be due to the injured employee.

<u>Id</u>. at 1152 (citations omitted). The Court's holding is founded on the recognition that a "tender back" requirement would be "wholly

---

the waiver requirements of § 626, and thus, such requirements pose no bar to its enforcement. Consequently, we find ourselves in respectful disagreement with the Seventh Circuit's recent decision in <u>Oberg v. Allied Van Lines, Inc.</u>, 1993 WL 483614 (7th Cir. Nov. 23 1993), in which the court concludes, without any analysis of the doctrine of ratification, that "[n]o matter how many times parties may try to ratify [a waiver] contract, the language of the OWBPA, '[a]n individual may not waive', [sic] forbids any waiver." <u>Id</u>. * 3. We believe that the court's conclusion in <u>Oberg</u> is at odds with the legislative history and congressional intent behind the OWBPA, <u>See</u> Note 8, *supra*, and overlooks the legal theories that define the doctrine of ratification of voidable contracts.

12

incongruous" with the right of recovery provided under the FELA and inconsistent with the objectives of that Act. The right of recovery under the FELA, however, is unique in that it advances a congressional intention of facilitating recovery by injured railroad workers against their employers.

The FELA was designed not simply to discourage negligent conduct, for indeed, the common law at the FELA's passage provided rail workers an action for negligence. Rather, the Act was designed with a broader purpose in mind: "to provide liberal recovery for injured workers," Kernan v. American Dredging Co., 355 U.S. 426, 432 (1957), and thus, "to put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations."[12] Wilkerson v. McCarthy, 336 U.S. 53,

---

[12]The FELA's legislative history testifies to this truth:

> [T]he employers' liability law . . . places such stringent liability upon the railroads for injuries to their employees as to compel the highest safeguarding of the lives and limbs of the men in this dangerous employment. The tremendous loss of life and limb on the railroads of this country is appalling. The total casualties to trainmen on the interstate railroads of the United States for the year 1908 was 281,645.
>
> It was the intention of Congress in the enactment of this law . . . to shift the burden of the loss resulting from these casualties from "those least able to bear it" and place it upon those who can, as the Supreme Court said in the Taylor case (210 U.S. 281), "measurably control their causes."
>
> The passage of the original act and the perfection thereof by the amendments herein proposed stand forth as a declaration of public policy to radically change, as far as congressional power can extend, those rules of the common law which the President, in a recent speech at Chicago, September 16, 1909, characterized as "unjust." President Taft in his address . . . referred

13

68 (1949) (concurring opinion of Justice Douglas). It accomplished these purposes by creating a statutory scheme that "stripped [an employer] of his common law defenses," and granted recovery if the "employer['s] negligence played any part, even the slightest, in producing the injury or death for which damages are sought." Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 506-7 (1956). These dramatic changes evinced a clear congressional intent "favoring unburdened and expeditious recoveries" by rail workers. Smith v. Pinell, 597 F.2d 994, 996 (5th Cir. 1979).

The FELA's statutory scheme removed several of the common-law obstacles hindering the injured rail worker's "unburdened and expeditious recovery." The Supreme Court in Hogue removed yet another common-law obstacle to the rail worker's congressionally encouraged recovery. By so acting, the Court advanced the FELA's purposes of providing liberal recovery to injured rail workers and thus, of shifting from them to their employers the heavy loss associated with their severe injuries.

No such purposes underlie the ADEA. Congress expressly declared that the purposes of the ADEA were "to promote employment

---

"to the continuance of unjust rules of law exempting employers from liability for accidents to laborers."

This public policy which we now declare is based upon the failure of the common-law rules as to liability for accident, to meet the modern industrial conditions and is based not alone upon the failure of those rules in the United States, but their failure in other countries as well.

GRIFFITH, THE VINDICATION OF A NATIONAL POLICY UNDER THE FEDERAL EMPLOYERS' LIABILITY ACT, 18 LAW & CONTEMP. PROB. 160 (1953)(quoting from 45 Cong. Rec. 4041 (1910)).

of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). Unjustified discrimination on the basis of age was the problem targeted by the ADEA. To redress this problem, Congress provided employees a wholly new right of action for age discrimination. Nowhere in section 621(b) did Congress express, however, its desire to actively facilitate an ADEA claimant's recovery.[13]

What Congress did under the FELA was something it has not yet done under the ADEA, that is, to legislatively facilitate an employee/claimant's recovery. Until Congress demonstrates its desire to promote "liberal," "unburdened and expeditious recoveries" to claimants under the ADEA, Grillet will remain sound authority and unaffected by Hogue.

We also note that there are fundamental differences between settling a claim for personal injury or death under the FELA and settling a potential claim for a possible ADEA violation in connection with an employer's pre-announced program for reduction in force. In the FELA situation the injury has in fact already

---

[13]We believe that the Seventh Circuit in Oberg, by adopting the reasoning of Forbus v. Sears, Roebuck & Co., 958 F.2d 1036 (11 Cir. 1992), and Isaacs v. Caterpillar, Inc., 765 F.Supp. 1359 (C.D.Ill. 1991), has improperly analogized the FELA to the ADEA and, thus, arrived at the erroneous conclusion that Hogue precludes a "tender back" requirement in suits brought under the ADEA. For the reasons set forth in this opinion, we consider these two "remedial" statutes to be fundamentally different in congressional purpose and intent. Consequently, we consider such an analogy inaccurate.

15

occurred; otherwise there is no FELA claim to settle.  However, in an ADEA situation dealing with a prospective reduction in force, such as involved here, the purpose of the settlement agreement is to compromise in advance a potential age discrimination event and to offset in advance any loss and injury which an employee might experience if such an event were to occur.

Moreover, the FELA has effectively rendered liability of the employer a given in the great majority of cases, leaving quantification of damages as the principal focus of settlement negotiations.  No such inference of liability exists as to ADEA claims; mere termination of employment is not sufficient to establish liability.  An ADEA claimant faces the burdensome task of proving that the termination of his employment was the result of unlawful age discrimination.  Therefore, the elements to be considered in the settlement of an ADEA claim involve not only damages, but also the more critical issue of threshold liability. Therefore, when (1) an employer presents his employee with a settlement agreement, the purpose of which is to resolve the issues of potential liability and damages under the ADEA, (2) the employee is given the opportunity to consider the agreement for a period of almost two months, and (3) the employer funds the agreed settlement consideration, thus performing its side of the bargain - all of which has occurred in this case, we believe justice and equity require the employee who seeks to avoid the obligations to which he agreed under the settlement agreement to return the consideration which he received for his promise not to sue.

## CONCLUSION

In light of the foregoing, we AFFIRM the district court's judgment.