Filed:  February 12, 1996

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

———————

No. 94-2223
(CA-93-2716-K)

———————

Burton Blistein,

Plaintiff - Appellant,

versus

St. John's College,

Defendant - Appellee.

———————

O R D E R

———————

The Court amends its opinion filed January 26, 1996, as follows:

On page 7, first full paragraph, line 5 -- the word "requisite" is deleted.

On page 11, footnote 7, line 4 -- the word "<u>e.g.</u>" is added after the word "<u>see</u>" and before the word "<u>Mitchell</u>."

On page 12, first paragraph, lines 3-4 -- the case name, <u>McDonnell Douglas</u>, should be in italics.

On page 13, first full paragraph, line 3 -- the words "be so intolerable as to" are added after the word "circumstances."

For the Court - By Direction


/s/ Bert M. Montague
_____
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BURTON BLISTEIN,
Plaintiff-Appellant,

v.                                             No. 94-2223

ST. JOHN'S COLLEGE,
Defendant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frank A. Kaufman, Senior District Judge.
(CA-93-2716-K)

Argued: November 1, 1995

Decided: January 26, 1996

Before WILKINSON, LUTTIG, and WILLIAMS, Circuit Judges.

_____

Affirmed by published opinion. Judge Luttig wrote the opinion, in
which Judge Wilkinson and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Christopher G. Mackaronis, BELL, BOYD & LLOYD,
Washington, D.C., for Appellant. Julie Ellen Squire, GALLAGHER,
EVELIUS & JONES, Baltimore, Maryland, for Appellee. **ON
BRIEF:** Laurie A. McCann, AMERICAN ASSOCIATION OF
RETIRED PERSONS, Washington, D.C., for Appellant. Peter E.
Keith, GALLAGHER, EVELIUS & JONES, Baltimore, Maryland,
for Appellee.

_____

**OPINION**

LUTTIG, Circuit Judge:

In what has become an unfortunate, although foreseeable, pattern, appellant Burton Blistein sued his employer St. John's College under the Age Discrimination in Employment Act after he sought, negotiated, and accepted pursuant to a written agreement a generous package of retirement benefits from the College upon learning that the College was required to eliminate his position because of substantial budget shortfalls. Notwithstanding that Blistein continues to accept the College's largess, he attacks the very retirement agreement to which he assented and by which the College has extended its generosity. The district court properly granted summary judgment in favor of the College.

I.

For twenty years, plaintiff-appellant Burton Blistein was the "artist in residence" at defendant-appellee St. John's College in Annapolis, Maryland. The College offers a unique Great Books program, in which all students take the same core courses and receive the same degree. The College does not offer a degree in the visual arts, nor are any art courses required for the degree. Art courses are electives offered through the College's Graduate Institute.

In 1991, the College experienced a severe budget deficit of over $300,000. The College's Board of Visitors and Governors immediately began to address the deficit, instituting, inter alia, a new policy restricting eligibility for post-retirement health benefits, which was to become effective July 1, 1992. And when the College's new president, Christopher Nelson, arrived soon thereafter, he embarked upon a cost-cutting campaign to eliminate the deficit in the short term and to fix the long-term problem caused by too great a draw on the College's endowment.

President Nelson's cost-cutting efforts included a department-by-department review of budgets, a hiring freeze, an across-the-board budget cut of four percent, and modifications to sick leave and vaca-

2

tion pay policies. During the department review, the College's dean, Eva Brann, recommended that the "artist in residence" position be eliminated as non-essential to the College's core academic program. Nelson agreed, and determined in early June 1992 to eliminate Blistein's position effective December 31, 1992.

Blistein was notified of the decision immediately, so that he would have the opportunity to retire before July 1, 1992, when he would become ineligible for post-retirement health benefits under the College's new benefits policy adopted the previous year. Blistein did decide to retire, negotiating a package of benefits in addition to the health benefits, including tuition assistance for his children, four months severance pay (about $15,000), medical benefits for his dependent children, and art studio space. Blistein's list of requested benefits was typed and signed by Fred Billups, the College's treasurer, and Blistein then delivered a hand-written letter of resignation on June 30, 1992. The College has not had an "artist in residence" since that time.[1]

After Blistein was denied unemployment benefits because of his severance pay, and notwithstanding that he had voluntarily resigned in return for the negotiated package of benefits from the College, Blistein decided to file a complaint of age discrimination with the Maryland Commission on Human Rights. The complaint, which was filed toward the end of 1992, was forwarded to the Equal Employment Opportunity Commission ("EEOC") in February 1993. As would be expected, when the College was notified of the complaint, its attorneys wrote to Blistein's attorney formally apprising him that

———————————————————————————————————————

[1] Blistein discussed the reason for his departure with Dean Brann in September 1992. According to Blistein, Dean Brann informed him that the "artist in residence" position was too costly; that the position was being eliminated because of the College's financial crisis; that there was some concern that he "might stay on an (sic) on" if the College did not force his resignation; and that some tutors thought a recent catalogue he had compiled was incompetently done. Dean Brann also stated, according to Blistein, that the June timing of the resignation was a deliberate effort to avoid a confrontation over the termination with students and faculty, and that the position had been eliminated to let Blistein avoid the humiliation of being fired. Appellant's Br. at 6-7.

the College had an agreement with Blistein under which he retired and was given a package of benefits. The April 14, 1993, letter closed by stating, "if Mr. Blistein wishes to repudiate that agreement, the College will reassess its obligations to him." J.A. at 152.

Blistein's attorney responded by telephone on May 18, and confirmed in a letter dated May 20, that because of the Supreme Court's decision in Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993), Blistein had decided against pursuing his ADEA claim and had agreed to withdraw his EEOC charge. The letter recited that the College had in turn agreed that upon withdrawal of Blistein's charge, it would "continue to treat [Blistein's] separation from employment as a voluntary resignation and that he [would] be entitled to continue to receive the benefits which he negotiated in June, 1992, prior to his submitting his letter of resignation." J.A. at 103.

Blistein wrote to the EEOC on May 28, 1993, stating: "I must regretfully withdraw my charge of age discrimination. . . ." J.A. at 104. In the same letter, however, Blistein said that he was concerned the College was going to withdraw his benefits, and he asked the EEOC to "hold actual implementation of withdrawal until you hear from me that [the negotiation concerning the status of my benefits] has been satisfactorily completed." Id. Blistein also attempted to have the EEOC pursue the charge so that he could technically "honor" his agreement with the College not to pursue the claim, yet still force the College to defend against his claim:

> I understand that the EEOC can, if it wishes, pursue this charge independently. I certainly do not object, as long as it is clear that I have officially withdrawn my charge.

Id. The EEOC notified Blistein on June 21, 1993, that it had granted his request to withdraw the charge.

After withdrawal of the EEOC charge, the College sent Blistein a "Release" of legal claims to "formalize Mr. Blistein's part of the bargain." J.A. at 155-57. Blistein never signed the release, and instead filed this action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. §§ 621-634 (West 1985 & Supp. 1995), on September 17, 1993. The College in turn filed a breach of contract

4

counterclaim, after which Blistein added retaliation and abuse of process claims to his complaint. The district court rejected the College's argument that Blistein's ADEA claim should be dismissed because Blistein had failed to exhaust his administrative remedies by withdrawing the complaint from the EEOC. It also rejected the argument that Blistein had waived his ADEA claim by entering into the retirement agreement. The district court granted summary judgment for the College, however, on the grounds that Blistein failed to make out a prima facie case of age discrimination and that he failed to show that the College's proffered non-discriminatory rationale for its decision was merely a pretext for discrimination. Although for reasons different from those of the district court, we affirm that judgment.

## II.

As a threshold matter, the College alleged below that Blistein waived his right to bring suit under the ADEA, either in June 1992, when he resigned and negotiated benefits from the College, or as a result of the May 1993 agreement between Blistein's attorney and the College. Both the College and Blistein moved for summary judgment on this issue. The district court held that neither of the two agreements was sufficient to constitute a valid waiver under the 1990 amendments to the ADEA. In reviewing that holding, we begin, as always, with the statute.[2]

_____

[2] We reject Blistein's contention that the issues decided against the College below are not before this court because the College did not cross-appeal. See Appellant's Br. at 9, 13 n.5; Appellant's Reply Br. at 5, 17-18. Blistein simply misreads Resolution Trust Corp. v. Maplewood Investments, 31 F.3d 1276 (4th Cir. 1994), in which we observed that a cross-appeal is not necessary when an appellee received a favorable judgment in the court below and seeks no modification of the award. Id. at 1278 n.2 (quoting Blum v. Bacon, 457 U.S. 132, 137 n.5 (1982) ("It is well accepted . . . that without filing a cross-appeal or cross-petition, an appellee may rely upon any matter appearing in the record in support of the judgment below.") and Blackwelder v. Millman, 522 F.2d 766, 771-72 (4th Cir. 1975) ("[Party prevailing below,] without cross-appeal, may support the judgment by urging any theory, argument, or contention which is supported by the record, even though it was specifically rejected by the lower court." (emphasis added) (internal quotation marks omitted))).

5

A.

Effective October 16, 1990, the ADEA was amended by the Older Workers Benefit Protection Act ("OWBPA"), which provides, in relevant part:

> (1) An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary. Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum--
>
> (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
>
> (B) the waiver specifically refers to rights or claims arising under this chapter;
>
> (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
>
> (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
>
> (E) the individual is advised in writing to consult with an attorney prior to executing the agreement;
>
> (F)(i) the individual is given a period of at least 21 days within which to consider the agreement; . . .
>
> (G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired . . . .

6

29 U.S.C.A. § 626(f) (West Supp. 1995).

Neither the June 1992 document listing the benefits Blistein was to receive nor the May 1993 letter from Blistein's counsel to the College includes the provisions from the OWBPA; the June agreement does not mention rights or claims under the ADEA, as required by subparagraph (B), and neither agreement contains the consideration and revocation time periods required by subparagraphs (F)(i) and (G), respectively. Contrary to the district court's belief, however, the absence of these statutory requirements rendered the retirement agreement merely voidable, not void, and we conclude that Blistein ratified the retirement agreement by accepting the substantial benefits provided thereunder.[3]

In O'Shea v. Commercial Credit Corp., 930 F.2d 358, 362 (4th Cir.), cert. denied, 502 U.S. 859 (1991), we held that an invalid release of an ADEA claim becomes valid when an employee accepts the benefits of a release agreement and thereby demonstrates an intent to ratify that agreement. Although the district court correctly noted that the termination agreement at issue in O'Shea was consummated prior to enactment of OWBPA, Blistein v. St. John's College, 860 F. Supp. 256, 260 (D.Md. 1994), it mistakenly concluded that the ratification theory underlying the holding in O'Shea did not survive OWBPA's enactment.

When it enacted OWBPA, Congress resolved a split among the circuits over how to determine whether an ADEA claim had been validly released. Several circuits had adopted a federal common law

_____

[3] Because we hold that Blistein's ratification of the retirement agreement created a binding contract, we reject Blistein's contention that the College's counterclaim to enforce that contract constituted retaliation under the ADEA. Indeed, in our view, the College presented a valid counterclaim that Blistein had breached his contract with the College. Both the June 1992 agreement, under which Blistein retired in exchange for a package of benefits, and the May 1993 agreement, under which Blistein promised to withdraw his ADEA complaint in exchange for the continued payment of those benefits, confirm an intention by the parties to form a retirement benefits contract, a contract which appears to have been breached by Blistein in bringing this action.

7

"totality of the circumstances" test, see O'Shea, 930 F.2d at 361 (citing cases), while others, including our circuit in O'Shea, had resorted to ordinary state law contract principles in resolving the question, see id. at 362 (citing cases). In enacting OWBPA, Congress essentially codified the "totality of the circumstances" test, rejecting application of ordinary state law contract principles in determining whether a release agreement is valid.**4** Nothing in OWBPA, however, abrogates the common law principle that an invalid agreement can be ratified by subsequent conduct. See Wamsley v. Champlin Refining & Chemicals, Inc., 11 F.3d 534, 539 (5th Cir. 1993), cert. denied, 115 S. Ct. 1403 (1995). OWBPA thus leaves intact our holding in O'Shea that ratification of an invalid release of an ADEA claim is possible. See O'Shea, 930 F.2d at 362. Indeed, if anything, the text of OWBPA lends support to that holding through its implicit recognition that an ADEA release agreement that does not meet OWBPA's requirements is merely a voidable, not a void, contract.

OWBPA provides that "[a]n individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary." 29 U.S.C.A. § 626(f)(1). The remainder of the section then defines when a waiver is to be deemed "knowing and voluntary." §§ 626(f)(1)(A)-(H). From Congress' reliance upon the terms "knowing" and "voluntary," which parallel the common law concepts of fraud, duress, and mistake, it is apparent that Congress was defining only those circumstances in which a contract would be voidable, not when it would be void. See S. REP. NO. 263 at 31-32, reprinted in 1990 U.S. CODE CONG. & ADMIN. NEWS at 1537 (referring to "the absence of fraud, duress, coercion, or mistake of material fact" in discussion of the "`knowing and voluntary' issue"). For, at common law, fraud, duress and mistake did not void a contract, but, rather, only

---

**4** See S. REP. NO. 263, 101st Cong., 2d Sess. 32, reprinted in 1990 U.S. CODE CONG. & ADMIN. NEWS 1509, 1537 ("The Committee expects that courts reviewing the `knowing and voluntary' issue will scrutinize carefully the complete circumstances in which the waiver was executed. The Committee expresses (sic) support for the [totality of the circumstances] approach taken on this limited issue in Cirillo v. Arco Chemical Co., 862 F.2d 448 (3rd Cir. 1988), and disapproves the [ordinary contract principles] approach adopted in Lancaster v. Buerkle Buick Honda Co., 809 F.2d 539 (8th Cir. 1987), cert. denied, [482 U.S. 928] (1987).").

8

rendered that contract voidable. <u>Wamsley</u>, 11 F.3d at 538 (citing RESTATEMENT (SECOND) OF CONTRACTS § 7 cmt. b).

Thus, an employee who unknowingly and involuntarily enters into a retirement agreement, as those terms are defined by OWBPA, has a voidable, not a void, contract, much like a party who enters into a contract under duress has a voidable, rather than a void, contract. Upon learning that the agreement is voidable, the employee, like the party who acted under duress, can either avoid performance of the contract or accept its benefits and thereby ratify the contract. <u>See Blakeney</u> v. <u>Lomas Information Systems, Inc.</u>, 65 F.3d 482, 485 (5th Cir. 1995). If the employee ratifies the agreement, a court does not "enforc[e] the promises contained in any of the allegedly voidable waiver agreements as such. What the court . . . enforc[es] is a new promise, evidenced by subsequent conduct, to be bound by the terms of the original waiver agreements." <u>Wamsley</u>, 11 F.3d at 540 n.11.

The district court, finding <u>O'Shea</u> inapplicable, rejected the Fifth Circuit's explicit holding in <u>Wamsley</u> that the ratification theory survives OWBPA's enactment. The district court followed instead the Seventh Circuit's decision in <u>Oberg</u> v. <u>Allied Van Lines, Inc.</u>, 11 F.3d 679 (7th Cir. 1993), <u>cert</u>. <u>denied</u>, 114 S. Ct. 2104 (1994), a decision which has since been questioned by the Seventh Circuit. <u>See Fleming</u> v. <u>U.S. Postal Service AMF O'Hare</u>, 27 F.3d 259, 261 (7th Cir. 1994) (noting that the Fifth Circuit in <u>Wamsley</u> "strongly criticized" <u>Oberg</u>, and finding "[t]he idea behind [<u>Oberg</u>] . . . [to be] a little obscure"), <u>cert</u>. <u>denied</u>, 115 S. Ct. 741 (1995). In following <u>Oberg</u>, the district court erred. <u>Wamsley</u>, not <u>Oberg</u>, is the post-OWBPA decision that is most in accord with our circuit precedent in <u>O'Shea</u>. If we were to follow <u>Oberg</u>, we would, as we observed in <u>O'Shea</u>, 930 F.2d at 363, allow persons like Blistein and O'Shea to have it "both ways," to retain the benefits that they receive pursuant to their retirement agreements, yet to challenge, through suits against their unsuspecting employers, the very agreements under which those benefits were extended. This, we find no evidence Congress contemplated.

B.

On the merits of whether Blistein relinquished through ratification any ADEA claim he might have had, Blistein argues that "there was

9

no release agreement to ratify" because the June retirement agreement does not even mention the ADEA. Appellant's Reply Br. at 22. Even though Blistein is technically correct that he never executed a formal written release agreement and that the June retirement agreement does not mention the ADEA, Blistein clearly agreed, through the May 18, 1993, conversation between his attorney and counsel for the College, to withdraw his ADEA claim in return for the College's promises to continue to treat Blistein's resignation as voluntary and to continue to pay him the benefits that he had earlier negotiated. That conversation was memorialized as follows in the May 20, 1993, letter from Blistein's attorney to the College:

> As we confirmed in our conversation, upon[Blistein's] withdrawal of his EEOC Charge, the College will continue to treat his separation from employment as a voluntary resignation and that he will be entitled to continue to receive the benefits which he negotiated in June, 1992, prior to his submitting his letter of resignation. . . .
>
> . . . [I]f this does not accurately set forth our understanding, please contact me.

J.A. at 103 (emphasis added). Thus, the agreement that existed implicitly in June, 1992, was made explicit in May, 1993: Blistein would not pursue any departure-related claims against the College (ADEA or otherwise) if the College would continue to abide by the June retirement agreement, treating Blistein's resignation as voluntary and continuing to pay the retirement benefits negotiated pursuant to that agreement.[5] By accepting the benefits of that agreement, with full awareness that that agreement did not meet the requirements of OWBPA,[6] Blistein ratified it and thereby forewent any claim under the ADEA.

---

[5] Even were we to accept the hypertechnical argument that Blistein did not agree in May, 1993, to waive his right to file an ADEA claim in federal court because the May 20 letter only states that he would withdraw his ADEA claim from the EEOC, Blistein would have but a Pyrrhic victory. For Blistein's agreement to treat his resignation as voluntary would ensure that he could never prevail on a claim under the ADEA, which requires discharge as an element of the prima facie case.

[6] Blistein's attorney acknowledges that he discussed the fact "that Mr. Blistein had never signed a release which would comport with the

10

III.

Because the district court erroneously held that Blistein had not waived his ADEA claim by ratifying the retirement agreement, it was obliged to consider the merits of Blistein's ADEA claim.

The ADEA makes it unlawful for an employer "to discharge any individual . . . because of such individual's age." 29 U.S.C.A. § 623(a)(1). An ADEA plaintiff may offer direct evidence that the decision to terminate him was motivated by age, or, alternatively, "may resort to the judicially created scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), and adapted to ADEA cases." E.E.O.C. v. Clay Printing Co., 955 F.2d 936, 940 (4th Cir. 1992).

Blistein proceeded under the McDonnell Douglas proof scheme. Under this scheme, the plaintiff in the usual ADEA case must demonstrate that: (1) he is a member of the protected class, (2) he was discharged, (3) at the time of discharge, he was performing at a satisfactory level, meeting his employer's legitimate expectations, and (4) following his discharge, he was replaced by someone of comparable qualifications[7] outside the protected class. Mitchell v. Data Gen-

_____

requirements of the Older Workers Benefit Protection Act" with counsel for the College during the May 18, 1993, discussion in which he stated that Blistein agreed he would withdraw his EEOC complaint if the College would continue to provide benefits. See J.A. at 296, 297 (letter from M. Foreman to M. Travieso of October 11, 1993). In any event, Blistein continues to this day to accept benefits from the College pursuant to the agreement.

[7] Our opinion in Clay Printing omitted the clause "comparable qualifications" in articulating the fourth element of the prima facie case. 955 F.2d at 941. However, we have repeatedly required proof, at the prima facie stage, that the replacement employee was comparably qualified, see, e.g., Mitchell, 12 F.3d at 1315; Western Electric, 713 F.2d at 1014, since the purpose of the prima facie case is to identify those circumstances in which a presumption of discrimination is reasonable. When the replacement employee has greater qualifications, an inference that the discharge

11

eral Corp., 12 F.3d 1310, 1315 (4th Cir. 1993); E.E.O.C. v. Western Elec. Co., Inc., 713 F.2d 1011, 1014 (4th Cir. 1983). The first and third elements of Blistein's prima facie case under McDonnell Douglas are not disputed: sixty-one at the time of his resignation, Blistein was clearly within the class of persons protected by the ADEA, see 29 U.S.C.A. § 631(a) (West 1985) (defining protected class as persons "who are least 40 years of age but less than 70 years of age"); and, although the record might support such an allegation, the College does not allege that Blistein was performing unsatisfactorily. There is a dispute over both the second and fourth elements, however. The district court erred in holding that Blistein satisfied the second element of his prima facie case, but correctly held that he failed to meet the fourth element.[8]

A.

With respect to the second element of his prima facie case, Blistein does not claim (nor could he) that he was actually discharged; rather, he contends that he was constructively discharged by the College. Typically, "[a] constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985) (internal quotation marks omitted), cert. denied, 475 U.S. 1082 (1986); see also Paroline v. Unisys Corp., 879 F.2d 100, 113-14 (4th Cir. 1989) (Wilkinson, J., dissenting), adopted by 900 F.2d 27 (4th Cir. 1990) (en banc). Blistein, however,

_____

was motivated by discrimination is simply not warranted. Cf. Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993) (holding that a Title VII plaintiff who was discharged for rules infractions must demonstrate, as part of his prima facie case for racially disparate discipline, "that the prohibited conduct in which he was engaged was comparable in seriousness to misconduct of employees outside the protected class" who were less severely disciplined (emphasis added)).

[8] Although we have no occasion to discuss at length Blistein's argument of pretext by the College, we agree with the district court that Blistein also failed to demonstrate that the College's proffered non-discriminatory rationale for its actions was merely pretext for discrimination.

12

claims not so much that his "working conditions" were made intolerable, but that the College's policy change regarding post-retirement health benefits eligibility, coupled with the College's announcement of its decision to eliminate his position before he would again become eligible for these benefits under the new eligibility rules, "forced" him to resign in June in order to receive benefits under the old eligibility rules.[9]

Several of our sister circuits have suggested that early retirement to prevent the withdrawal or reduction of benefits might, under some circumstances, be so intolerable as to give rise to a constructive discharge. See, e.g., Smith v. World Ins. Co., 38 F.3d 1456, 1461 (8th Cir. 1994); Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 480 (1st Cir. 1993); Christopher v. Mobil Oil Corp., 950 F.2d 1209, 1214 (5th Cir.), cert. denied, 113 S. Ct. 68 (1992); Mitchell v. Mobil Oil Corp., 896 F.2d 463, 467 (10th Cir.), cert. denied, 498 U.S. 898 (1990); Bodnar v. Synpol, Inc., 843 F.2d 190, 193 (5th Cir.), cert. denied, 488 U.S. 908 (1988). This is not the case here, however, because Blistein has offered no evidence that his continued employment would even have approached the intolerable.

"Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign. Rather, "[i]ntolerability. . . is assessed by the objective standard of whether a `reasonable person' in the employee's position would have felt compelled to resign," Bristow, 770 F.2d at 1255

---

**9** Blistein cannot argue that the College's change in eligibility for health benefits alone resulted in his constructive discharge, because the policy change affected all employees of the College equally, and thus was manifestly not targeted at Blistein. See Bristow, 770 F.2d at 1255 ("Where . . . all employees are treated identically, no particular employee can claim that difficult working conditions signify the employer's intent to force that individual to resign."). Nor of course can he argue that the College's elimination of his position constituted a constructive discharge, because his claim is that he was discharged in June, six months prior to the College's anticipated elimination of his position in December.

13

(emphasis added) -- that is, whether he would have had <u>no choice</u> but to resign. While Blistein arguably proffered evidence sufficient to show that it was in his economic interest to resign, he utterly failed to proffer evidence that he was compelled to do so.

First, even assuming that the College's change in eligibility for post-retirement health benefits, combined with the subsequent decision to eliminate Blistein's position, constituted a"withdrawal" of benefits from Blistein, the benefits were wholly gratuitous, as Blistein himself concedes. J.A. at 353 (Blistein Depo.) ("[T]he college can change any of the benefits at any time.").**10** The withdrawal of gratuitous benefits simply cannot make continued employment so intolerable that an employee would be compelled to resign. We reject the <u>dictum</u> in <u>Vega</u> relied upon by the district court, 860 F. Supp. at 263, to the extent that it could be read to suggest otherwise. <u>See Vega</u>, 3 F.3d at 480 ("[A] plaintiff who has accepted an employer's offer to retire can be said to have been constructively discharged when the offer presented was, at rock bottom, a choice between early retirement with benefits or discharge without benefits." (internal quotation marks omitted)).

Second, the notice that Blistein received from the College in June that his position was to be eliminated in December was not even a threatened withdrawal of benefits, as Blistein contends. The College was under no obligation to notify Blistein that it planned to eliminate his position, and had it not done so, Blistein would not have been eligible (as a consequence of the broad policy change adopted over a year earlier) for the post-retirement health benefits when his position was eliminated in December. The June notice therefore allowed Blistein to choose either the status quo of continuing to work without

_____

**10** President Nelson explained the nature of the benefits as follows:

> It was always the understanding that the practice[on post-retirement medical benefits] could be modified at any time and that these benefits were not considered to be lifetime benefits, that is as the policy would change at the college, so could the postretirement. If the college would choose to take it away, this could be taken away even as to people who have retired.

J.A. at 342 (Nelson Depo.).

14

eligibility for benefits until the elimination of his position, or a profitable early retirement package that included not only the post-retirement health benefits, but severance pay, tuition assistance, and other benefits as well. In effect, the June notification was an inducement to early retirement, and inducements can never render continued employment intolerable. As the First Circuit held in Vega, "[m]ere offers for early retirement, even those that include attractive incentives designed to induce employees who might otherwise stay on the job to separate from the employer's service, do not transgress the ADEA." 3 F.3d at 480; see also Henn v. National Geographic Soc., 819 F.2d 824, 826 (7th Cir.) ("When one option makes the recipient better off, and the other is the status quo, then the offer is beneficial. That the benefits may overwhelm the recipient and dictate the choice cannot be dispositive."), cert. denied, 484 U.S. 964 (1987).

It is true that the status quo prior to the decision to eliminate Blistein's position was that Blistein's employment post-July 1 would have included at least the possibility of renewed eligibility for post-retirement health benefits when he became 65, whereas once the decision to eliminate his position was made, it was certain that his continued employment would have been without even such a possibility. However, the elimination of a mere possibility of future eligibility for benefits can no more render continued employment intolerable than can the withdrawal of gratuitous benefits. Cf. Christopher, 950 F.2d at 1215 (distinguishing between lost expectation of future benefits and loss of benefits to which one is already entitled).

Insofar as his alleged constructive discharge is concerned, Blistein is no differently situated than was the plaintiff in Ackerman v. Diamond Shamrock Corp., 670 F.2d 66 (6th Cir. 1982), a decision with which we fully agree. Ackerman, like Blistein, was informed by his superior that his position was to be eliminated, was offered a valuable package of benefits beyond that for which he was otherwise eligible, had ample time to consider the offer, consulted an attorney, and ultimately signed the agreement, received the benefits, and subsequently filed an ADEA claim, claiming that he had been constructively discharged. Id. at 68. Ackerman's argument was roundly rejected by both the district court and the court of appeals on the same ground that Blistein's analogous argument must be rejected -- his retirement was entirely voluntary. Id. at 69-70.

15

Because Blistein wholly failed to proffer evidence that the College's offer in any way made his continued employment intolerable, or that his departure was anything other than voluntary, the district court erred in holding that Blistein was constructively discharged and therefore that he met the second element of his prima facie case.

B.

Blistein also fails the fourth element of his prima facie case, namely, that following his discharge he was replaced by someone of comparable qualifications outside the protected class. Mitchell, 12 F.3d at 1315. Although no one has replaced Blistein as "artist in residence," Blistein argues that he nevertheless satisfied this element of his case because some of his former duties were assumed by Ms. Zelamski, a woman in her late twenties and therefore outside the protected class. Even if the courses assumed by Ms. Zelamski were the primary duties of the "artist in residence," Blistein himself was first offered the opportunity to continue to teach those courses on the same part-time contractual terms eventually offered to Ms. Zelamski, an offer which he declined. Thus, the hiring of Ms. Zelamski has no probative force on the question of whether the College presumptively engaged in age discrimination against Blistein.

Furthermore, Blistein acknowledges that only some of his former duties were assumed by Ms. Zelamski; other duties were assumed by various individuals employed by the College who were themselves within the protected class,[11] and some of Blistein's duties were not assumed by anyone. The facts here are therefore quite different from those in Gaworski v. ITT Commercial Finance Corp., 17 F.3d 1104, 1109 (8th Cir.), cert. denied, 115 S. Ct. 355 (1994), relied on by Blistein, where the replacement employee assumed virtually all of the duties of the discharged employee's position except the job title. The fact that Blistein, as the College's "artist in residence," taught a few

_____

[11] Because Blistein was not "replaced" by anyone, our requirement that an ADEA plaintiff must show he was replaced by someone outside the protected class in order to satisfy the fourth element of his prima facie case is in no way implicated in this case. See O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 546 (4th Cir. 1995), cert. granted, 116 S. Ct. 472 (Nov. 13, 1995).

classes in life-drawing and sculpture that were assumed by Ms. Zelamski on a part-time, contractual basis after his departure, or that other employees of the College assumed various other of the duties previously performed by Blistein,**12** does not mean that someone replaced Blistein as "artist in residence." It is therefore more appropriate to address this as a reduction-in-force case.

In reduction-in-force cases where there is no replacement employee, proof of the fourth element is still required, albeit in modified form. Western Electric, 713 F.2d at 1014-15. A plaintiff in such circumstances can establish this element of his prima facie case "either by showing that [comparably qualified] persons outside the protected class were retained in the same position <u>or</u> by producing some other evidence indicating that the employer did not treat age neutrally [in deciding to dismiss the plaintiff]." Herold v. Hajoca Corp., 864 F.2d 317, 320 (4th Cir. 1988) (quoting Western Electric, 713 F.2d at 1014-15), <u>cert</u>. <u>denied</u>, 490 U.S. 1107 (1989).**13**

We reject at the outset any suggestion that the College's retention of a 36-year-old part-time athletic director constitutes evidence that

_____

**12** The fact that the College wished to continue aspects of its visual arts program if possible given its budget constraints, and that the College was willing and able to persuade existing faculty to shoulder additional responsibilities in order to do so, is not inconsistent with the College's view that the "artist in residence" position was non-essential. It is through precisely such efforts that academic employers operate within budget constraints while at the same time maximizing educational opportunities for their students.

**13** In reduction-in-force cases, where relative performance was the basis of the discharge of some employees from within a group selected for reduction, we have modified both the third and the fourth elements, requiring proof that: (3) the plaintiff was performing at a level substantially equivalent to the lowest level of those retained; and (4) the process of selection produced a residual work force with some unprotected persons who were performing at a level lower than that at which the plaintiff was performing. <u>Mitchell</u>, 12 F.3d at 1315; <u>Duke</u> v. <u>Uniroyal Inc.</u>, 928 F.2d 1413, 1418 (4th Cir.), <u>cert</u>. <u>denied</u>, 502 U.S. 963 (1991). Because the College's decision to eliminate Blistein's position was not based on relative performance, the <u>Mitchell</u>/<u>Duke</u> formulation is not appropriate in this case.

someone outside the protected class was retained in the same position as Blistein, merely because both positions were considered "non-essential" to the College's core academic function. Defining the positions at such a high level of generality as Blistein proposes, see Appellant's Br. at 16 ("[T]he College's Director of Athletics . . . also occupied a position that, like the artist-in-residence, was not a part of the `academic curriculum of the college.'"); Appellant's Reply Br. at 3 (referring to the Director of Athletics as a "comparable non-essential position"); id. at 4 (referring to other non-essential personnel as "comparably situated"), does not make them the "same" for purposes of determining whether we should draw a presumption of age discrimination from the fact that one is retained and the other abolished.

Blistein also urges us to consider certain "other evidence" that the employer did not treat age neutrally. Herold, 864 F.2d at 320. In doing so, we bear in mind that, as the Supreme Court has repeated time and again, a prima facie case should be deemed established only "under circumstances which give rise to an inference of unlawful discrimination." Burdine, 450 U.S. at 253; see also Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 874 (1984) ("A plaintiff meets [his] initial burden [of establishing a prima facie case] by offering evidence adequate to create an inference that he was denied an employment opportunity on the basis of a discriminatory criterion . . . ."); Burdine, 450 U.S. at 254 ("[T]he prima facie case `raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" (quoting Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978))). An ADEA plaintiff therefore meets the fourth element of his prima facie case under the "other evidence" prong of the Herold/Western Electric formulation only by offering evidence from which age discrimination may reasonably be inferred. None of the "other evidence" Blistein offers permits such an inference.

First, Blistein advances the fact that "substantially younger employees in other non-essential positions were unaffected by the College's cost-cutting measures" as "[other] evidence that the College did not treat age `neutrally' in the decision to terminate [him]." Appellant's Br. at 15-16. However, the athletic director is the only

18

such person Blistein identifies from outside the protected class. We have already rejected as insufficient to raise an inference of age discrimination the retention of the athletic director because that position is not "the same" as the "artist in residence" position occupied by Blistein. Lest we allow in the back door of "other evidence" that which we have rejected at the front, the retention of the athletic director cannot serve as "other evidence."

In any event, in order for a comparison of dissimilar positions to serve as "other evidence" from which an inference of age discrimination would be possible, the ADEA plaintiff must identify the retention of considerably more than a single person outside the protected class. An inference of discrimination might be raised, for example, if every protected person had been discharged, while every non-protected person had been retained, even though the positions being compared are wholly dissimilar, but the retention of merely one (or even a substantial number) of unprotected persons in dissimilar positions is at least as likely to be a consequence of the particular need for those positions than of age discrimination. It thus likewise cannot serve as "other evidence" from which a reasonable inference of age discrimination can be drawn.

Blistein does point to four other non-essential employees -- the four employees whose salaries, like Blistein's, exceeded the benchmarks of a compensation study conducted by the College -- whom he claims were younger than he, see Appellant's Br. at 24 n.7, and therefore whose retention serves as evidence that the College did not treat age neutrally, even though they were all within the ADEA protected class. Blistein misstates the evidence, however, for two of these four employees were, in fact, older than Blistein. See J.A. at 646. Thus, even if relative age differences within the protected class could support a prima facie case of age discrimination, an argument which we have repeatedly rejected, see, e.g., Clay Printing, 955 F.2d at 941, the district court was correct in recognizing that "the fact that employees older than [Blistein], whose salaries also exceeded the [compensation study], were not terminated would appear to cut against [Blistein's] claim of age discrimination." 860 F. Supp. at 268.

Finally, Blistein argues that because "the timing of [his] termination was allegedly orchestrated because of the College's upcoming

19

change in post-retirement medical benefits -- eligibility for which was dependent on a minimum age of 55[,] . . . it is clear that [his] age influenced at least some of the decisions pertaining to his termination." Appellant's Reply Br. at 4, 5. This argument, however, is essentially an attempt to resurrect through the "other evidence" prong an argument we have already rejected in our discussion of whether Blistein was constructively discharged. "The timing" of the College's notice to Blistein of the planned elimination of the "artist in residence" position amounted to an early retirement offer because it allowed Blistein to avail himself of post-retirement health benefits before the College's policy change rendered him ineligible for them. To be sure, Blistein was only eligible under the old policy, and the notice therefore only amounted to an early retirement offer, because Blistein was over 55 and had more than ten years of service with the College. To that extent, age was implicated in Blistein's departure, but the ADEA specifically excludes voluntary early retirement incentives from its coverage. See 29 U.S.C.A. § 623(f)(2)(B)(ii). Thus, while the fact that Blistein was only eligible for the early retirement incentive because of his age might be evidence that age was not treated neutrally, it cannot be "other evidence" what would give rise to an inference of an ADEA violation.

Because Blistein failed to meet the fourth element of his prima facie case, the district court properly granted summary judgment for the College.

* * * * *

In affirming the district court's judgment that this plaintiff is not entitled to relief, we cannot help but pause and reflect upon the effect that cases such as this have upon the important body of antidiscrimination law.

Here, an institution of higher education responsibly made the hard decisions required to operate within its budgetary constraints. In a right-minded effort to lessen the impact of those decisions on one of its affected employees, the institution immediately apprised the employee of the action, so that the employee could receive substantial benefits to which he would not otherwise have been entitled. And in a further overture of goodwill, the institution agreed to provide the

20

employee with yet additional and substantial benefits for himself and his family to which the employee also would not otherwise have been entitled. In return for, and after accepting, the institution's munificence, the employee turned around and lodged a complaint with the Equal Employment Opportunity Commission, repudiating the very agreement that he himself had sought and under which his negotiated benefits were provided.

When it appeared to the employee that he stood to lose the valuable benefits that the institution had agreed to provide him, he promised to (and did) withdraw the charges filed with the EEOC, but only after attempting to conscript the EEOC to pursue the claim on his behalf so that the institution would receive what he believed was its deserved retribution, while at the same time he could "honor" his promise not to pursue the claim and retain the benefits provided by his employer. Ultimately, when the EEOC with good cause declined to pursue the claim, the employee reneged on even his new promise by refusing to sign a formal release of claim. For reasons that can only be the subject of surmise, the employee then retained new legal counsel and brought his claim against the institution, naturally ignoring his own course of conduct and the institution's reasonable reliance thereon, and resting instead on the technicality that he never actually signed a formal agreement that he would not sue the institution. All the while, and without apology, the employee continues to accept the substantial benefits provided by the institution. And to add insult to injury, he has the temerity to argue that the institution's efforts to defend itself against the employee's baseless claims constitute retaliation and abuse of process.

Such a lawsuit, which is not atypical of many filed in analogous contexts, is precisely the type of litigation that every day threatens to undermine, rather than advance, the laudable objectives of the antidiscrimination laws by causing the courts and the public alike to view even the most meritorious claims with suspicion. The district court obviously recognized this lawsuit for what it was, and we do, as well.

21

Accordingly, the judgment of the district court is affirmed.

AFFIRMED

22